MORETZ ET AL., APPELLEES, *v.* MUAKKASSA, APPELLANT, ET AL.

**[Cite as *Moretz v. Muakkassa,* 137 Ohio St.3d 171, 2013-Ohio-4656.]**

*Trials—Evidence—Hearsay—Learned-treatise exception—Evid.R. 803(18)— Illustrations from medical textbooks are subject to learned-treatise hearsay exception and are not admissible into evidence as exhibit over objection of party—Interrogatories—When both content and form of proposed interrogatory are proper, Civ.R. 49 requires trial court to submit interrogatory to jury—R.C. 2317.421—Expert testimony not required for admission of evidence of write-offs, reflected on medical bills and statements, as prima facie evidence of reasonable value of medical services.*

(No. 2012-0797—Submitted April 9, 2013—Decided October 24, 2013.)

APPEAL from the Court of Appeals for Summit County,

No. 25602, 2012-Ohio-1177.

_____

**SYLLABUS OF THE COURT**

1.  Illustrations from medical textbooks are subject to the learned-treatise hearsay exception set forth in Evid.R. 803(18) and therefore shall not be admitted into evidence as an exhibit over the objection of a party.

2.  When both the content and the form of a proposed interrogatory are proper, Civ.R. 49 imposes a mandatory duty upon the trial court to submit the interrogatory to the jury.

3.  R.C. 2317.421 obviates the necessity of expert testimony for the admission of evidence of write-offs, reflected on medical bills and statements, as prima facie evidence of the reasonable value of medical services. (R.C. 2317.421, construed.)

**O'CONNOR, C.J.**

{¶ 1}  In this appeal, we review four issues from the Ninth District Court of Appeals, which upheld the trial court's judgment entering a jury verdict against appellant, Kamel Muakkassa, M.D., in favor of appellees, Larry J. Moretz and Nicole L. Moretz.  For the reasons explained, we hold that the court of appeals improperly affirmed the judgment.  We conclude that the court of appeals properly affirmed the trial court's decision to grant the Moretzes leave to file late a transcript of a videotaped deposition, because the trial court's error, if any, was harmless.  But we hold that it improperly affirmed the trial court's decisions (1) to admit, over objection, as an exhibit an illustration from a learned treatise, (2) to refuse to submit a properly drafted interrogatory to the jury, and (3) to prohibit Dr. Muakkassa from presenting evidence of "write-offs" to contest the Moretzes' medical bills without a foundation of expert testimony on the reasonable value of the medical services rendered.  We further hold that these errors, taken together, deprived Dr. Muakkassa of a fair trial.  Accordingly, we reverse the judgment of the Ninth District Court of Appeals, and we remand this case to the trial court for a new trial.

## RELEVANT BACKGROUND

*The surgery*

{¶ 2}  On September 28, 2005, Larry J. Moretz underwent surgery to remove a grapefruit-sized mass from his pelvis.  The mass was discovered in May 2005 when Mr. Moretz sought treatment at an emergency room for pain in his lower back.  The emergency-room physician directed Mr. Moretz to follow up with his family physician.  In turn, the family physician referred him to Dr. Muakkassa, a board-certified neurosurgeon.  Dr. Muakkassa diagnosed an anterior sacral meningocele.

**{¶ 3}** A meningocele is a type of congenital cyst. A sacral meningocele is a cyst located at the lowest part of the spinal cord next to the tailbone. "Anterior" means that the cyst was growing from the front of the spine or, in other words, from the back to the stomach. Anterior cysts are rare.

**{¶ 4}** Dr. Muakkassa recommended that Mr. Moretz consult Gary B. Williams, M.D., a general surgeon, for removal of the cyst using a laparoscopic approach. Ultimately, because Dr. Williams's attempt to remove the cyst laparoscopically was not successful, he surgically opened Mr. Moretz's abdomen, according to the contingency plan. Dr. Williams moved the organs and other structures out of the way in order to expose the cyst.[1]

**{¶ 5}** Once the cyst was exposed, Dr. Williams put a surgical stitch at the bottom and at the top of the cyst and then cut out the cyst. Dr. Muakkassa entered the operating room periodically to check on the progress of the procedure and confirmed for Dr. Williams that the stitches had closed the cyst, so that no cerebral spinal fluid was leaking. Dr. Muakkassa did not "scrub in," i.e., he did not participate in the surgery or perform any part of the procedure himself.

**{¶ 6}** Dr. Williams submitted tissue from the cyst to a pathologist for analysis. The pathologist's report reflected the diagnosis as "soft tissue with a neurenteric cyst." A neurenteric cyst is also a type of congenital cyst.

**{¶ 7}** As a result of the surgery, Mr. Moretz permanently lost bladder, bowel, and sexual function. The Moretzes filed this action against Drs. Williams and Muakkassa and alleged that their malpractice had caused Mr. Moretz's injuries. The case against Dr. Muakkassa proceeded to trial.

**{¶ 8}** At trial, the Moretzes contended that Dr. Muakkassa should never have recommended that the cyst be accessed through Mr. Moretz's abdomen.

---

1. The parties do not dispute that only Dr. Williams was qualified to perform laparoscopic surgery or that only Dr. Williams was qualified to perform surgery to open Mr. Moretz's abdomen and move the internal organs to expose the cyst.

Also central to their case was the nature of the role Dr. Muakkassa was supposed to play in the removal of Mr. Moretz's cyst, once it was exposed through the abdomen.

*Motion in limine*

{¶ 9}   The Moretzes filed a motion in limine that sought to prohibit Dr. Muakkassa from offering evidence or making any argument at trial that the reasonable value of the medical services associated with Mr. Moretz's injuries was the amount equal to the actual amount accepted as full payment for the services after the "write-off"[2] unless he supported that argument with expert testimony.

{¶ 10} The trial court granted the motion and held that "the issue here is not whether Defendant can present evidence of the write-offs, but whether he can do so without expert testimony in support of this evidence."   The trial court explained that by enacting R.C. 2317.421, the General Assembly created a statutory presumption that medical bills reflect the reasonable value of medical services, but it held that the legislature "has not created any such presumption for write-off payments."   Accordingly, it held that evidence of write-offs was not admissible unless Dr. Muakkassa supported it with expert testimony.

*Civ.R. 32(A) motion*

{¶ 11} On the first day of the trial, after the jury was impaneled and sworn, Dr. Muakkassa's counsel orally moved to preclude the Moretzes from playing the videotaped deposition of their expert witness, board-certified neurosurgeon Gary C. Dennis, M.D., on the ground that the transcript had not been timely filed.   Civ.R. 32(A) requires that any deposition intended to be used as evidence "must be filed at least one day before the day of trial or hearing unless

---

2. "A 'write-off' is the difference between the original amount of a medical bill and the amount accepted by the medical provider as the bill's full payment." *Robinson v. Bates*, 112 Ohio St.3d 17, 2006-Ohio-6362, 857 N.E.2d 1195, ¶ 10.   *See also Jaques v. Manton*, 125 Ohio St.3d 342, 2010-Ohio-1838, 928 N.E.2d 434, ¶ 14.

for good cause shown the court permits a later filing." And although the trial court acknowledged that the defense was "absolutely correct" that a violation had occurred, it excused the Moretzes' failure to file the transcript as "technical noncompliance" and permitted the video deposition to be played for the jury that day. Defense counsel had received the video transcript a few days before, and the trial court concluded that Dr. Muakkassa had not been ambushed by the late filing. Trial commenced, and the transcript was filed with the court the following day.

*Allegations of malpractice*

{¶ 12} At trial, Mr. Moretz testified that after initially meeting with Dr. Muakkassa and submitting to testing, Dr. Muakkassa explained to him that he had a hole in his tailbone and the membrane surrounding the spinal cord, permitting spinal fluid to force its way out. Dr. Muakkassa recommended that Dr. Williams be consulted so that the possibility of laparoscopic surgery to treat the cyst could be explored, with the understanding that if laparoscopic surgery failed, Dr. Williams could open up Mr. Moretz's abdomen and "move everything out of the way" so that the cyst could be accessed. Mr. Moretz understood that if an open surgery took place, once the cyst was exposed, Dr. Muakkassa would remove it because he was the neurosurgeon and the cyst was attached to the spinal cord.

{¶ 13} The Moretzes also presented the video deposition of Dr. Dennis, who testified that Mr. Moretz's surgery required the expertise of a neurosurgeon. Dr. Dennis described his understanding of the standard of care applicable to a neurosurgeon when performing a surgical procedure on a meningocele:[3]

---

3. Dr. Dennis explained that there is a "covering of the spinal cord that we call the meninges." When this "outer envelope" forms a sac or a cyst, it is called a meningocele. A meningocele, which is a neural-tube-closure defect, can occur anywhere along the spine. He explained that meningoceles used to be more prevalent until folic acid began to be used as an additive in cereals in the mid- to late 1990s.

Well, when you operate on those structures, one thing you need is you need magnification. So as a general rule, you can use either loupes, which are little telescopic glasses or you can use a microscope. * * * And the other is a way to identify the nerves themselves. One can inspect an area but, usually, when you have abnormalities that are congenital, sometimes it's hard to tell a difference between a piece of fibrous tissue and a nerve. Especially, when the nerves are little rootlets, which are very tiny. So in cases like that, we always use a nerve stimulator. That's, of course, the way I was trained and that's the way all neurosurgeons are trained in the United States.

{¶ 14} Accordingly, Dr. Dennis opined that Dr. Muakkassa proximately caused Mr. Moretz's injuries when he breached the standard of care applicable to a neurosurgeon. First, Dr. Muakkassa failed to "scrub in," i.e., he did not physically assist in the removal of the cyst, but merely observed. Second, he failed to use, or recommend that Dr. Williams use, magnification to identify and protect the nerves. Third, he failed to use, or recommend that Dr. Williams use, stimulation to identify and protect the nerves.

{¶ 15} Fourth, Dr. Dennis explained that Dr. Muakkassa had failed to recommend the best approach for reaching the cyst. He testified that the only rarity in Mr. Moretz's condition was the anterior location of the cyst. And his review of the literature disclosed that it is easier to operate on anterior cysts by using a posterior approach, i.e., by going through the back, "because then you can see the origin of the nerve roots."

{¶ 16} Because Mr. Moretz permanently lost bladder, bowel, and sexual function as a result of the surgery, Dr. Dennis opined that Dr. Williams had cut nerves while operating on the cyst. He explained that because Mr. Moretz's cyst

had been there for a long time, "the nerves are going to be plastered to the side of it." Dr. Dennis acknowledged that the pathologist had found no nerves in the tissue that was submitted for analysis, but reasoned that the pathologist's finding did not undermine his position, because the entire cyst was not excised.

*Rebuttal of the allegations*

{¶ 17} Dr. Muakkassa testified in his own defense and explained that after ordering and reviewing CT scans and an MRI, he diagnosed Mr. Moretz as having an anterior sacral meningocele. He testified that the MRI, which is "extremely sensitive," showed that there were no nerves in Mr. Moretz's cyst. A radiologist also concluded from the MRI films that there were no nerves in Mr. Moretz's cyst.

{¶ 18} In Dr. Muakkassa's view, there were no nerves in the cyst and thus the cyst did not require the expertise of a neurosurgeon. The trouble was the "extremely rare" anterior location of the cyst and the difficulty of getting to it in the first place.

{¶ 19} Dr. Muakkassa testified that "in the old days," neurosurgeons had to treat anterior cysts using a posterior approach. And he acknowledged that some still do. Dr. Muakkassa testified about advancements in the treatment of anterior cysts, including removal by general surgeons using laparoscopic techniques and an anterior approach, which he recommended to Mr. Moretz and which Mr. Moretz ultimately opted to pursue.

{¶ 20} Dr. Muakkassa understood that if laparoscopic surgery failed, Dr. Williams would open Mr. Moretz's abdomen and remove the cyst, and Dr. Muakkassa would be present to make sure that there was no spinal fluid leaking after the cyst was closed. Dr. Muakkassa testified that in any event, he was available to scrub in and physically help Dr. Williams, if he had been needed and if he had been asked.

**{¶ 21}** Dr. Muakkassa testified that he did not use magnification or encourage Dr. Williams to use magnification because it was not necessary. If there had been nerves, he contended, they would have been large enough for him to see with the naked eye, even without scrubbing in. Similarly, he explained that nerve stimulation, which is used to protect the spinal cord, was not necessary because "there is no spinal cord in that area to monitor."

**{¶ 22}** Dr. Muakkassa testified that he discovered that he was wrong about Mr. Moretz having a meningocele when he reviewed the report of the pathologist, who had conclusively determined that the mass was a neurenteric cyst. And he explained that by definition, neurenteric cysts have no nerves.

**{¶ 23}** On cross-examination, counsel attempted to elicit testimony from Dr. Muakkassa that meningoceles located at the anterior sacral position have nerves. Dr. Muakkassa disagreed.[4] At that point, over defense objection, counsel produced an illustration,[5] which had been photocopied from a medical textbook authored by Edward C. Benzel, M.D. The textbook was entitled "Spine Surgery: Techniques, Complication Avoidance, and Management," and the illustration was entitled, "anterior sacral meningocele." This exchange then followed:

> Q. Doctor, does this accurately depict the anatomy of an anterior sacral meningocele, do you believe?
>
> A. No.
>
> Q. You don't. Okay. So you don't believe there is a potential for the nerve roots to be over the sac; is that correct?
>
> A. Correct.

---

4. According to Dr. Muakkassa's testimony, posterior meningoceles can have nerves when they occur in children, but anterior sacral meningoceles do not.

5. The illustration was later marked Exhibit 36.

{¶ 24} Dr. Muakkassa also presented the expert testimony of board-certified neurosurgeon Mark R. McLaughlin, M.D., who also testified that Mr. Moretz had a neurenteric cyst, not a meningocele. Dr. McLaughlin explained that neurenteric cysts are abnormalities that occur while the fetus is forming and that consist of "an area of tissue that fails to properly form * * * while the tissues are all migrating into their appropriate position." "It's something that is associated with spinal abnormalities, but it doesn't have nervous tissue in it; and it's really more of a digestive gut abnormality than it is a nervous system abnormality." Accordingly, he testified that Dr. Williams, a general surgeon, was the "best suited doctor" to approach the cyst and that it was "perfectly appropriate" for Dr. Muakkassa to simply be in the operating room as an advisor.

{¶ 25} On cross-examination, counsel questioned Dr. McLaughlin extensively about the standard of care for the treatment of meningoceles and, in doing so, confronted him with Dr. Benzel's illustration:

> Q.    And in this authoritative text don't they show nerve roots here stretched over the sac?
>
> A.    Yes, they do.
>
> Q.    You wouldn't disagree that that is what can occur, do you?
>
> A.    No, that is what can occur.  And a neurenteric cyst can look very similar to that.

{¶ 26} On redirect, the following exchange occurred:

> Q.    Did anyone identify a nerve coursing over the cyst?
>
> A.    No, not in the operative report.
>
> * * *

Q.     You have been on the stand here on cross-examination for over an hour and 15 minutes and you have been asked over and over about the care and treatment of an anterior sacral meningocele.

Was this an anterior sacral meningocele?

A.     No, it was not.

{¶ 27} Dr. Williams also testified.[6]  He explained that he had assumed that Dr. Muakkassa would actively participate in Mr. Moretz's surgery as co-surgeon, but Dr. Muakkassa did not scrub in.  Nevertheless, Dr. Muakkassa was in the operating room at times during Mr. Moretz's surgery, and he looked into Mr. Moretz's abdomen and observed what Dr. Williams was doing.  During the surgery, Dr. Williams asked Dr. Muakkassa if there was anything special that he needed to do, and Dr. Muakkassa answered that there was not.  Dr. Williams testified that there was no need for Dr. Muakkassa to scrub in during the surgery.  Even so, at one point he invited Dr. Muakkassa to scrub in, but Dr. Muakkassa declined and stated that Dr. Williams was doing fine.  Indeed, Dr. Williams testified that had he asked Dr. Muakkassa, "would you scrub in and help me," he had "no doubt" that Dr. Muakkassa would have done so.

{¶ 28} On cross-examination, Dr. Williams testified that he is not qualified to perform neurosurgery and is not trained in the surgical treatment of meningoceles.  He also testified that he had assumed that Dr. Muakkassa would have taken care of any necessary nerve monitoring, and if Dr. Muakkassa had told him that he needed to use magnification or stimulation, he would have done so.

---

6. The record reflects that both parties intended to call Dr. Williams as a witness.  For Dr. Williams's convenience, the Moretzes agreed to delay their examination of him until after he testified in Dr. Muakkassa's case-in-chief.

*Admission of the exhibit*

{¶ 29} At the close of evidence, the Moretzes moved to admit the illustration as an exhibit, and Dr. Muakkassa objected on the ground that "the authoritative text wasn't cross-examined." In deciding the issue, the trial court reasoned that "the fact that this depiction comes from a learned treatise does not obviate the fact that it is, in fact, an artistic diagram, and as such, presuming it is properly authenticated as accurately representing the anatomy in question, is properly admissible." Because it concluded that Dr. McLaughlin had authenticated the illustration, the trial court admitted it as evidence.

*Rejection of the interrogatory*

{¶ 30} Before charging the jury, the trial court reviewed the interrogatories and verdict forms with counsel. While doing so, it rejected an interrogatory proposed by Dr. Muakkassa that would have required the jurors, in the event of an adverse verdict, to specify in what respect he had been negligent. Defense counsel argued that he thought there were four acts that Dr. Dennis had described as negligent but that he could only remember (1) the failure to scrub in, (2) the failure to use magnification, and (3) the failure to use stimulation.[7] When defense counsel told the court that he could not remember the fourth, the Moretzes' attorney provided it: "Posterior approach." Defense counsel agreed, "Yeah, that he should have used the posterior approach rather than anterior approach."

{¶ 31} The trial court held, "I don't find that there are multiple allegations of negligence separate and independent from one another, and so I'm not going to allow that interrogatory." In the trial court's view, Dr. Dennis's criticisms all

---

7. Although counsel did not specify at the time, the record is clear that Dr. Dennis's testimony was also that Dr. Muakkassa breached the standard of care in failing to instruct Dr. Williams to use magnification and in failing to instruct Dr. Williams to use nerve stimulation.

boiled down to one allegation: that Dr. Muakkassa breached the standard of care because he failed to scrub in.

*Jury verdict*

{¶ 32} Six jurors concluded that Dr. Muakkassa was negligent and that his negligence proximately caused Mr. Moretz's injuries. The same six jurors found the total loss to be $995,428.73. The damages interrogatories disclosed that the verdict represented $205,828.73 in economic loss, including $125,869.13 in medical bills, $539,600 in noneconomic loss to Mr. Moretz, and $250,000 in noneconomic loss to Mrs. Moretz.

{¶ 33} In light of the $500,000 statutory cap on noneconomic damages, the trial court reduced the award to Mr. Moretz by $39,600. And it granted Dr. Muakkassa's motion for setoff due to the settlement reached with Dr. Williams, thereby reducing the jury verdict by an additional $195,400. After awarding the Moretzes prejudgment interest, the trial court entered a final judgment against Dr. Muakkassa in the amount of $953,858.08. Both parties appealed.[8] The court of appeals affirmed.

*The Ninth District litigation*

{¶ 34} On appeal, Dr. Muakkassa raised four assignments of error that are relevant here.

{¶ 35} First, he argued that the trial court had abused its discretion by permitting the Moretzes to play the video deposition of their expert witness, Dr. Dennis, even though they had not timely filed the transcript of the deposition or shown good cause for the late filing, as required by Civ.R. 32(A). 2012-Ohio-1177, ¶ 7. Dr. Muakkassa contended that he would have been entitled to a directed verdict had the video deposition been properly excluded. But because Dr. Muakkassa was not surprised or in any way prejudiced by the late filing, the

---

8. The Moretzes raised one assignment of error, not at issue in this appeal, which unsuccessfully sought to reverse the setoff. 2012-Ohio-1177, at ¶ 59-60.

Ninth District affirmed the trial court's decision to permit the video deposition to be played for the jury. *Id.* at ¶ 10.

**{¶ 36}** Second, Dr. Muakkassa argued that the trial court had abused its discretion when it refused to submit to the jury an interrogatory requiring the jurors to specify in what respect it found him negligent. According to the court of appeals, the trial court rejected the interrogatory for two reasons: "(1) all allegations of negligence were dependent upon his failure to scrub in to the surgery, and (2) the narrative form was likely to confuse the jury." *Id.* at ¶ 14. Even though it recognized that Dr. Dennis had testified that Dr. Muakkassa violated the standard of care in three separate ways, the Ninth District affirmed because "[t]here is no evidence that Dr. Muakkassa could have used either magnification or nerve stimulation techniques without scrubbing in to the procedure." *Id.* at ¶ 16.

**{¶ 37}** Third, Dr. Muakkassa argued that the trial court had abused its discretion by admitting as an exhibit the medical illustration from a learned treatise. The court of appeals acknowledged that Evid.R. 803(18) permits the admission of statements from learned treatises only when offered in connection with an expert witness's testimony. *Id.* at ¶ 18. And it acknowledged that learned treatises " 'may not be received as exhibits.' " *Id.*, quoting Evid.R. 803(18).

**{¶ 38}** But because Dr. McLaughlin testified that the illustration is accurate, that the text is authoritative, and that the relevant chapter is "excellent," the court of appeals concluded that the exhibit was properly authenticated, and therefore admissible, as "an artistic rendering of human anatomy." *Id.* at ¶ 19.

**{¶ 39}** The Ninth District reasoned that Evid.R. 803(18) "is primarily aimed at passages in treatises containing 'theories and opinions' " of the author. *Id.* at ¶ 24, quoting *Piotrowski v. Corey Hosp.*, 172 Ohio St. 61, 69, 173 N.E.2d 355 (1961). The court of appeals concluded that Evid.R. 803(18) did not apply because the rule was meant to address "statements" and the only statement that

the medical illustration asserted was that it accurately depicted an anterior sacral meningocele. *Id.* at ¶ 25. Because in its view, Dr. McLaughlin adopted that assertion as his own,[9] the court concluded that the illustration was not hearsay and therefore was not subject to the rule. Finally, the court of appeals concluded that admission of the exhibit did not prejudice Dr. Muakkassa, because the illustration did not tend to prove that Mr. Moretz had a meningocele. *Id.* at ¶ 26.

{¶ 40} Finally, Dr. Muakkassa argued that the trial court incorrectly excluded evidence of write-offs without expert testimony regarding reasonableness. The court of appeals affirmed that holding on the ground that the presumption of reasonableness of medical bills codified at R.C. 2317.421, which obviates the need for foundational expert testimony, applies to plaintiffs and not defendants. *Id.* at ¶ 41-42.

{¶ 41} We accepted Dr. Muakkassa's appeal under our discretionary jurisdiction. 132 Ohio St.3d 1481, 2012-Ohio-3334, 971 N.E.2d 960 (accepting Proposition of Law No. IV); 132 Ohio St.3d 1527, 2012-Ohio-4308, 974 N.E.2d 1206 (accepting Proposition of Law Nos. I, II, and III on reconsideration). The four propositions of law before us assert:

> Proposition of Law No. 1: The Ninth District's decision excusing a party from the mandatory filing requirements for depositions has effectively rendered Civ.R. 32(A) meaningless and the end result will be uncertainty throughout Ohio as to the requisite procedures for filing depositions pursuant to Civ.R. 32(A).
>
> Proposition of Law No. 2: The Ninth District's decision allowing for the admission of a portion of a medical textbook as a

---

9. Dr. McLaughlin's testimony was that a nerve root "can" be stretched over an anterior sacral meningocele as depicted in the illustration, not that it was in this instance.

trial exhibit is both legally and factually flawed, in direct conflict with Evid.R. 803(18) and the end result will be uncertainty throughout Ohio as to the proper use of learned treatises.

Proposition of Law No. 3: The Ninth District's decision disallowing a jury interrogatory regarding appellees' multiple claims of negligence is legally and factually flawed, is internally inconsistent and contradictory, is in direct conflict with decisions rendered by this court and other appellate courts throughout Ohio and effectively renders Civ.R. 49(B) meaningless.

Proposition of Law No. 4: The Ninth District's decision requiring that evidence of "write-offs" of medical bills be supported by expert testimony is in direct conflict with this court's decision in *Jaques v. Manton*, 125 Ohio St.3d 342, 2010-Ohio-1838, 928 N.E.2d 434, and has, consequently, redefined the collateral source rule as set forth by this court.

{¶ 42} We now address each in turn.

## ANALYSIS

### *Civ.R. 32(A)*

{¶ 43} The Ninth District properly affirmed the trial court's decision to grant the Moretzes leave to file late the transcript of Dr. Dennis's videotaped deposition even though the trial court failed to expressly make a determination that good cause existed for the delay.

{¶ 44} Civ.R. 32(A) provides: "Every deposition intended to be presented as evidence must be filed at least one day before the day of trial or hearing unless for good cause shown the court permits a later filing."

{¶ 45} The rule imposes a mandatory duty to file certain depositions at least one day before trial. The Moretzes filed the deposition transcript on the

second day of trial. There can be no dispute that the Moretzes failed to comply with the timing requirement of Civ.R. 32(A).

{¶ 46} "However hurried a court may be in its efforts to reach the merits of a controversy, the integrity of procedural rules is dependent upon consistent enforcement because the only fair and reasonable alternative thereto is complete abandonment." *Miller v. Lint*, 62 Ohio St.2d 209, 215, 404 N.E.2d 752 (1980). We reaffirm that important principle today. Trial courts have a duty to ensure proper adherence to the governing rules, including Civ.R. 32(A), in order to afford fairness to all parties.

{¶ 47} Although the trial court's duty to enforce Civ.R. 32(A)—including the duty to permit a late filing for good cause shown—was clear and unequivocal, its holding in this regard was murky and tentative. The trial court acknowledged that a late filing can be excused only for good cause, but it failed to make an express finding on cause. But the court made sufficient inquiry to establish that Dr. Dennis's trial deposition was not taken until the Wednesday before trial, July 7, 2010. And on the first day of trial, July 12, 2010, when defense counsel moved to exclude Dr. Dennis's videotaped testimony based on the failure to comply with Civ.R. 32(A), the Moretzes' counsel told the court that he still had not received a transcript.

{¶ 48} In deciding whether to permit a late filing, the trial court explained that the rules, including Civ.R. 32(A), are designed to prevent and guard against undue surprise and trial by ambush. And it held that "in light of the fact that this was designated a trial deposition, at all times was described as such *for good*—I find that there is no surprise in this matter and that I will permit the playing of the video deposition despite the Plaintiffs' technical noncompliance with 32(A)." (Emphasis added.)

{¶ 49} In explaining its reasons for permitting a late filing, the trial court used the words "for good," which we presume was a truncated preamble to a

16

good-cause finding that the trial court unfortunately never made express. Moreover, the trial court's characterization of the Civ.R. 32(A) violation as "a mere technical noncompliance" was apparently an inartful way of saying "good cause." Use of the phrase "technical noncompliance" implies that the trial court acknowledged the late filing but excused it for a good reason, i.e., good cause.

{¶ 50} In turn, the Ninth District held that "the trial court exercised proper discretion in determining there was good cause" to permit a later filing. 2012-Ohio-1177, ¶ 10. In doing so, the court of appeals engaged in an extensive discussion of why, on this record, a violation of Civ.R. 32(A) could not have prejudiced or surprised Dr. Muakkassa. To that end, the court of appeals appropriately gave great weight to the fact that Dr. Muakkassa had ample notice that the Moretzes intended to use the deposition at trial.

{¶ 51} Specifically, the court of appeals noted that one month before trial, the Moretzes filed a document entitled "Notice of Videotaped Trial Testimony of Gary C. Dennis, M.D.," which reflected that "[t]he videotaped trial testimony will be used as evidence in the trial of this matter." And five days before trial, Dr. Muakkassa's attorney was in Baton Rouge, Louisiana, actively participating in Dr. Dennis's trial deposition. We also note that Dr. Dennis testified that he has an active neurosurgery practice in Louisiana that calls on him to treat patients on both emergency and elective bases. In addition to treating patients at his office, Dr. Dennis provides neurosurgical care at three hospitals that serve "a very large area in Louisiana." There is every indication that the timing of Dr. Dennis's trial deposition was carefully coordinated by everyone involved, considering the schedules of one busy physician and three lawyers in the midst of trial preparation.

{¶ 52} For all of these reasons, we hold that if the trial court committed any error in failing to expressly determine whether good cause existed for the delay, on this record, it was harmless.

*Evid.R. 803(18)*

**{¶ 53}** The trial court abused its discretion when it granted the Moretzes' motion to admit as an exhibit a medical illustration from a learned treatise. In doing so, it refused to apply the hearsay rule that governs the use of learned treatises, Evid.R. 803(18).

**{¶ 54}** In 2006, Ohio amended its hearsay rules by adopting Evid.R. 803(18). 109 Ohio St.3d LXXXI, LXXXVII. This new exception to the hearsay rule permits the admission of statements from learned treatises during the testimony of expert witnesses. Evid.R. 803 provides:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
>
> * * *
>
> **(18) Learned Treatises.** To the extent called to the attention of an expert witness upon cross-examination or relied upon by the expert witness in direct examination, statements contained in published treatises, periodicals, or pamphlets on a subject of history, medicine, or other science or art, established as a reliable authority by the testimony or admission of the witness or by other expert testimony or by judicial notice. *If admitted, the statements may be read into evidence but may not be received as exhibits.*

(Emphasis added.)

**{¶ 55}** Evid.R. 803(18) replaced former Evid.R. 706, 109 Ohio St.3d LXXXI, which permitted the limited use of learned treatises only for impeachment purposes, and thus prohibited their use during direct examination. Evid.R. 803(18) was adopted in acknowledgement of the fact that in forming their

opinions, expert witnesses necessarily rely on "background hearsay * * * in the form of the out-of-court statements of textbook authors, colleagues, and others." 2006 Staff Notes to Evid.R. 803(18). "The rule makes explicit the sources of the expert's opinion, and in doing so both avoids disputes about the level of detail in their testimony and assists the trier of fact in evaluating that testimony." *Id.*, citing *Beard v. Meridia Huron Hosp.*, 106 Ohio St.3d 237, 2005-Ohio-4787, 834 N.E.2d 323.

*The exhibit was hearsay, subject to Evid.R. 803(18)*

{¶ 56} The court of appeals improperly approved the trial court's admission of the illustration as an exhibit by reasoning: "Although an illustration in a textbook could include 'statements' of the type Rule 803(18) was meant to address, exhibit 36 does not." 2012-Ohio-1177, at ¶ 24.

{¶ 57} We hold that illustrations from medical textbooks are subject to the learned-treatise hearsay exception set forth in Evid.R. 803(18) and therefore shall not be admitted into evidence as an exhibit over the objection of a party. The purpose of a medical illustration is to explicate the medical text. Because an illustration gives meaning to written statements, textbook authors use them to more fully explain complex medical concepts, anatomical structures, and conditions. Thus, they do not differ from text for purposes of the rule. When a party uses a medical illustration in connection with an expert's testimony, the illustration is inextricably intertwined with both the author's statements and the testimony of the expert witness. The simple act of separating the illustration from the text by photocopying does not divorce it from its context or somehow transform it into a neutral artist's rendering.

{¶ 58} The exhibit at issue in this case has a heading that reads, "Chapter 83: Anterior Sacral Meningocele." The medical illustration depicts what appears to be a cross-section of a spine and various other structures, identified by name, including a "ventral nerve root transversing pedicle" and the "terminal syrinx." A

large balloon-like structure (not identified, but presumably the meningocele) protrudes in front of the spine, near the end of its length. The balloon has a darkened spot that is labeled "tumor." Two thin tubes begin at what is labeled "spinal cord" and extend to the balloon-like structure. One of the tubes appears to wrap around it. The tubes are labeled, "nerve root stretched over sac." Nothing is labeled "sac." Underneath the illustration is the following caption: "**Figure 83.1** Illustration of a typical anatomic scenario regarding a congenital anterior sacral meningocele. Intrathecal (filum terminale), intracystic, and extracystic-intrapelvic tumors may be associated."

{¶ 59} Exhibit 36 is a highly technical medical illustration that lacks clear meaning without interpretation from a medical expert. Although the context is not readily understandable, the illustration plainly makes the "statement" that nerves coming from the spinal cord are wrapped around a sac. The title and the caption invite the inference that the sac is a meningocele. And the caption makes the assertion that the illustration depicts a "typical anatomic scenario."

{¶ 60} The inescapable conclusion is that the exhibit was offered for the truth of the matter asserted by Dr. Benzel: anterior sacral meningoceles have nerves. Accordingly, in light of the objection, the trial court was required to prevent the jury from receiving the illustration as independent evidence.

{¶ 61} We now turn our attention to an inquiry into the prejudice that resulted from the trial court's error.

*Admission of the exhibit unfairly prejudiced Dr. Muakkassa*

{¶ 62} Dr. Benzel's medical illustration was evidence bearing on a dispositive question, i.e., whether Mr. Moretz's cyst had nerves. By admitting the illustration as an exhibit, the trial court failed to do what was required, i.e., it failed to prevent the jurors from giving excessive weight to Dr. Benzel's illustration and from interpreting the illustration in the jury room on their own.

{¶ 63} Evid.R. 803(18) contains "safeguards against unreliability and misuse":

> Misunderstanding is guarded against by the fact that the statements in learned treatises come to the trier of fact only through the testimony of qualified experts who are on the stand to explain and apply the material in the treatise. The rule provides that the treatise may be read into evidence but not received as an exhibit to prevent the trier from giving it excessive weight or attempting to interpret the treatise by itself.

2006 Staff Notes to Evid.R. 803(18).

{¶ 64} In this case, the Moretzes used the medical illustration as evidence to bolster their claim that Mr. Moretz's cyst had nerves in it and to undermine Dr. Muakkassa's position that the cyst had no nerves because it was a neurenteric cyst. Dr. Muakkassa does not object to the Moretzes' reliance on the illustration. He objects to its admission into evidence as an exhibit.

{¶ 65} In closing arguments, the Moretzes' counsel emphasized the importance of the medical illustration by stating:

> We had a drawing up from the book published by Dr. Benzel that was a representative drawing of an anterior presacral meningocele of the type Larry had * * *.
>
>> * * *
>
> [J]ust to remind you that Plaintiffs' Exhibit 36, *which you will get, so, if you so choose, you can look at this* * * *. Dr. McLaughlin, who, by the way, knows that doctor very well who prepared this text and thinks highly of him, whether this was a [sic]

representative of a type of cyst that Mr. Moretz had at that time and he indicated yes, because we were having this dispute about whether or not there are nerves here.

＊ ＊ ＊

＊ ＊ ＊ Certainly this is evidence that their expert indicated this is a cyst of the type that Mr. Moretz had that potentially had nerve root stretched over it.

(Emphasis added.)

{¶ 66} Dr. Williams testified that he is not qualified to perform neurosurgery and, likewise, not trained in the surgical treatment of meningoceles. On the other hand, he does have experience operating on neurenteric cysts. As the Moretzes' counsel made clear during closing argument, "There was a fight in this case as to whether or not it was a meningocele ＊ ＊ ＊. ＊ ＊ ＊ [I]f it's not a meningocele, maybe they are not in the nervous system and maybe they don't need a neurosurgeon ＊ ＊ ＊. You will determine that." To that end, the Moretzes' counsel directed the jurors' attention to Exhibit 36 and stated, "That has nerves in it."

{¶ 67} We agree with the Moretzes' trial counsel that this case hinged on whether there were nerves in Mr. Moretz's cyst. The Moretzes prevailed in convincing enough jurors that there were; they garnered the minimum number of votes necessary to sustain a verdict in their favor. But they did so by doing an end run around Evid.R. 803(18). During trial, the Moretzes' counsel justified using the illustration to cross-examine Drs. Muakkassa and McLaughlin by invoking Evid.R. 803(18). As required by Evid.R. 803(18), before using the medical illustration to cross-examine Dr. McLaughlin, the Moretzes' trial counsel laid a foundation by eliciting testimony from him that he believed Dr. Benzel's medical textbook was authoritative. But later, when it was time to move for exhibits to be

22

admitted into evidence, counsel changed gears and asserted that the illustration was not hearsay, because Dr. McLaughlin had adopted it as his own statement.

{¶ 68} The trial court accepted the Moretzes' argument and justified doing so by relying on an unreported court of appeals case, *Robertson v. McCue*, 9th Dist. Summit No. 19539, 2000 WL 14118 (Jan. 5, 2000), that was decided six years before Evid.R. 803(18) was adopted.

{¶ 69} In *Robertson*, a physician performed surgery on Robertson's wrists. An unsuccessful result led to a malpractice suit. At trial, both parties prepared diagrams to demonstrate what they believed had happened during surgery. Expert testimony authenticated the physician's diagram, but no expert testified as to the accuracy of Robertson's diagram.

{¶ 70} The trial court admitted the physician's diagram but ruled that Robertson's was inadmissible because no expert had authenticated it. The jury returned a verdict for the defense, and the Ninth District affirmed.

{¶ 71} *Robertson* is factually distinguishable. To begin, the diagram in *Robertson* was not an illustration photocopied from a learned treatise. *Robertson* involved an original artist's rendering that was generated for the purpose of litigation. Moreover, the relevant legal issue in *Robertson* was authentication of the exhibit, not whether it was hearsay admissible under an exception that did not even exist at the time. Even now, authentication is irrelevant under Evid.R. 803(18) because learned treatises are not admissible as exhibits.

{¶ 72} Even if Evid.R. 803(18) had been in effect when *Robertson* was decided, the *Robertson* court would have had no reason to analyze it. The exhibit in *Robertson* was not from a learned treatise. By the same token, *Robertson* gave the trial court here no justification for ignoring Evid.R. 803(18).

{¶ 73} Nevertheless, the trial court in this case emphasized that the *Robertson* court had opined, "Given the technical, and unfamiliar, nature of the subject matter of this action, the court properly determined that 'it would be very

unfair to submit this to the jury without any pictures.' " *Robertson* at *3. Even if that reasoning had been relevant under Evid.R. 803(18), it directly conflicts with that rule's prohibition against jurors interpreting technical and unfamiliar material in the jury room by themselves, without the aid of an expert. Thus, the trial court here should have recognized that reliance on *Robertson* was misplaced.

{¶ 74} Here, Evid.R. 803(18) clearly prohibited admission of the illustration as an exhibit. Nevertheless, it was so admitted, and the Moretzes' trial counsel described the exhibit as proving that "that cyst has nerves." Whether the cyst had nerves was central to the case and was hotly contested. In deciding that issue, the jurors were invited to interpret a highly technical medical illustration in the jury room, by themselves.

{¶ 75} The trial court was required to exclude the illustration as an exhibit to prevent the jurors from giving it excessive weight and from attempting to interpret the material themselves. By failing to do what was required, the trial court deprived Dr. Muakkassa of his right to a fair jury deliberation.

*Proposed interrogatory*

{¶ 76} The trial court abused its discretion when it refused to submit to the jury a properly drafted interrogatory offered by Dr. Muakkassa.

{¶ 77} The interrogatories proposed by Dr. Muakkassa stated:

**INTERROGATORY (A):**

Have plaintiffs proven by a preponderance of the evidence that Kamel Muakkassa, M.D. was negligent?

* * *

**IF THE ANSWER OF SIX OR MORE JURORS TO (A) IS "YES," COMPLETE THE ANSWER TO INTERROGATORY (B).**

* * *

**INTERROGATORY (B):**

State the respect in which you find Kamel Muakkassa was negligent.

The trial court rejected Interrogatory (B).

{¶ 78} Civ.R. 49(B) provides:

The court shall submit written interrogatories to the jury, together with appropriate forms for a general verdict, upon request of any party prior to the commencement of argument. * * * The interrogatories may be directed to one or more determinative issues whether issues of fact or mixed issues of fact and law.

{¶ 79} "The purpose of an interrogatory is to 'test the jury's thinking in resolving an ultimate issue so as not to conflict with its verdict.' " *Freeman v. Norfolk & W. Ry. Co.*, 69 Ohio St.3d 611, 613, 635 N.E.2d 310 (1994). When both the content and the form of a proposed interrogatory are proper, Civ.R. 49 imposes a mandatory duty upon the trial court to submit the interrogatory to the jury. *See id.* A proper interrogatory is designed to lead to " 'findings of such a character as will test the correctness of the general verdict returned and enable the court to determine as a matter of law whether such verdict shall stand.' " *Id.* at 613-614, quoting *Bradley v. Mansfield Rapid Transit, Inc.*, 154 Ohio St. 154, 160, 93 N.E.2d 672 (1950). Accordingly, "[w]hen the plaintiff's allegations include more than one act of negligence, it is proper to instruct the jury to specify of what the negligence consisted." *Freeman* at 614, citing *Davison v. Flowers*, 123 Ohio St. 89, 174 N.E. 137 (1930), at paragraph four of the syllabus. We have repeatedly approved interrogatories requesting the jury to state " 'in what respects the defendant was negligent.' " *Freeman* at 614, quoting *Ragone v. Vitali &*

*Beltrami, Jr., Inc.*, 42 Ohio St.2d 161, 327 N.E.2d 645 (1975), at paragraph two of the syllabus.

{¶ 80} In this case, the trial court was incorrect when it held that all of Dr. Dennis's allegations boiled down to a single complaint that Dr. Muakkassa did not scrub in for surgery.

{¶ 81} Dr. Dennis testified that Dr. Muakkassa breached the standard of care in four ways: (1) he failed to scrub in to the surgery and operate himself, (2) he failed to use magnification or recommend that Dr. Williams use it, (3) he failed to use stimulation or recommend that Dr. Williams use it, and (4) he failed to recommend a posterior approach.

{¶ 82} Dr. Muakkassa recommended and, in fact, arranged for Mr. Moretz's surgery to proceed through his abdomen. Three weeks before the surgery, Dr. Williams confirmed in writing that Mr. Moretz was scheduled for surgery on September 28, 2005, and that "[s]urgery will consist of a laparoscopic excision of a presacral mass, possible open." Therefore, the allegation that Dr. Muakkassa was negligent in recommending the anterior approach is immaterial to when and if Dr. Muakkassa scrubbed in to surgery several weeks later.

{¶ 83} While it is debatable on this record whether a surgeon can use magnification or stimulation himself if he does not scrub in to the surgery, the allegations here were also that Dr. Muakkassa was negligent in failing to *recommend* that Dr. Williams use magnification and stimulation. Dr. Muakkassa was in the operating room and observed the surgical field, at which time Dr. Williams asked for and received his guidance. Dr. Williams testified unequivocally that he did not need Dr. Muakkassa to do the actual cutting on the cyst, but that "it made me comfortable that he agreed that what I was doing was proper." And although Dr. Williams did not believe that magnification or stimulation would have made a difference, he testified that he would have used both, if Dr. Muakkassa had recommended it.

26

**{¶ 84}** Finally, magnification and stimulation are separate tools, which can be used independently and for different purposes. Magnification makes nerves more visible, while stimulation identifies nerves too tiny to see with magnification. Dr. McLaughlin testified that whether magnification is used depends on how the surgeon was trained, while nerve stimulation is an option whose use varies by region.

**{¶ 85}** Accordingly, because several distinct allegations of negligence were made, Dr. Muakkassa was entitled to have the jury specify of what the negligence consisted. Moreover, the narrative form of the proposed interrogatory was proper because it tracked the precise language that we approved in *Freeman*. The trial court's error in rejecting the interrogatory deprived Dr. Muakkassa of his right to test the jury verdict.

*Damages evidence*

**{¶ 86}** The trial court abused its discretion when it prohibited Dr. Muakkassa from attempting to show that the reasonable value of medical services is equal to the amount paid after write-offs unless he laid a foundation through expert testimony.

**{¶ 87}** On several occasions, we have had the opportunity to clarify the law on the use of evidence of write-offs in negligence actions. *Robinson v. Bates*, 112 Ohio St.3d 17, 2006-Ohio-6362, 857 N.E.2d 1195; *Jaques v. Manton*, 125 Ohio St.3d 342, 2010-Ohio-1838, 928 N.E.2d 434. We have repeatedly recognized that "either the bill itself or the amount actually paid can be submitted to prove the value of medical services." *Robinson* at ¶ 7.

**{¶ 88}** In *Robinson*, we recognized that "R.C. 2317.421 makes * * * bills prima facie evidence of the reasonable value of charges for medical services." *Id.* at ¶ 9. R.C. 2317.421 provides:

In an action for damages arising from personal injury or wrongful death, a written bill or statement, or any relevant portion thereof, itemized by date, type of service rendered, and charge, shall, if otherwise admissible, be prima-facie evidence of the reasonableness of any charges and fees stated therein for medication and prosthetic devices furnished, or medical, dental, hospital, and funeral services rendered by the person, firm, or corporation issuing such bill or statement, provided, that such bill or statement shall be prima-facie evidence of reasonableness only if the party offering it delivers a copy of it, or the relevant portion thereof, to the attorney of record for each adverse party not less than five days before trial.

{¶ 89} Based on the plain language of the statute, in *Robinson* we affirmed the court of appeals' holding that the trial court had erred when it refused to allow the original medical bills to be admitted into evidence. *Id.* at ¶ 9. But we noted that the court of appeals erred when it held that the collateral-source rule applied to exclude evidence of write-offs. *Id.* at ¶ 10. We explained that the collateral-source rule "prevents the jury from learning about a plaintiff's income from a source other than the tortfeasor so that a tortfeasor is not given an advantage from third-party payments to the plaintiff." *Id.* at ¶ 11. And we concluded that the common-law collateral-source rule does not exclude evidence of write-offs of expenses that are never paid. A write-off is not a payment, and thus it cannot constitute payment of a benefit. *Id.* at ¶ 16. Thus, evidence of write-offs can be admitted because the tortfeasor "does not obtain a 'credit' " therefrom. *Id.*

{¶ 90} Moreover, we declined to adopt a categorical rule that the reasonable value of medical services is either the amount billed or the amount paid. *Id.* at ¶ 17. "Instead, the reasonable value of medical services is a matter

28

for the jury to determine from all relevant evidence." *Id.* "The jury may decide that the reasonable value of medical care is the amount originally billed, the amount the medical provider accepted as payment, or some amount in between." *Id.* at ¶ 18.

{¶ 91} In *Jaques*, we revisited our decision in *Robinson* in light of the intervening enactment of R.C. 2315.20,[10] which largely abrogated the common-law collateral-source rule. *Id.,* 125 Ohio St.3d 342, 2010-Ohio-1838, 928 N.E.2d 434, at ¶ 1. We explained that R.C. 2315.20 "pertains only to 'evidence of any amount payable as a benefit to the plaintiff.' " *Id.* at ¶ 11. We concluded that our common-law analysis set forth in *Robinson* applies equally in the context of the statute because the statute's "formulation is no different substantively from the common-law rule described in *Robinson* as excluding only 'evidence of benefits *paid* by a collateral source.' " (Citation omitted; emphasis sic.) *Id.* Accordingly, we reaffirmed that " '[b]oth the original medical bill rendered and the amount accepted as full payment are admissible to prove the reasonableness and necessity of charges rendered for medical and hospital care.' " *Id.* at ¶ 15, quoting *Robinson,* 112 Ohio St.3d 17, 2006-Ohio-6362, 857 N.E.2d 1195, at ¶ 17.

{¶ 92} We reaffirm our holdings in *Robinson* and *Jaques* and hold that pursuant to R.C. 2317.421, evidence of "write-offs," reflected in medical bills and

---

10. R.C. 2315.20 provides:

> (A) In any tort action, the defendant may introduce *evidence of any amount payable as a benefit to the plaintiff* as a result of the damages that result from an injury, death, or loss to person or property that is the subject of the claim upon which the action is based, except if the source of collateral benefits has a mandatory self-effectuating federal right of subrogation, a contractual right of subrogation, or a statutory right of subrogation or if the source pays the plaintiff a benefit that is in the form of a life insurance payment or a disability payment. However, evidence of the life insurance payment or disability payment may be introduced if the plaintiff's employer paid for the life insurance or disability policy, and the employer is a defendant in the tort action.

(Emphasis added.)

statements, is prima facie evidence of the reasonable value of medical services. But whether this sort of evidence requires the party offering it to lay a foundation for its admission through expert testimony is an open question. The court of appeals held that expert testimony is required before evidence of write-offs may be admitted. The court held that the presumption of reasonableness for medical bills contained in R.C. 2317.421 does not extend to write-offs, and because the reasonable value of medical services is outside the common knowledge of laypeople, expert testimony is necessary as a foundation for presentation of this evidence to the jury. 2012-Ohio-1177, at ¶ 41. We do not agree.

{¶ 93} Before the enactment of R.C. 2317.421, Ohio courts "require[d] the usually empty ceremonial of having a doctor testify that the charge * * * made for a particular service is a reasonable and customary one." *De Tunno v. Shull*, 166 Ohio St. 365, 377, 143 N.E.2d 301 (1957) (Bell, J., concurring). R.C. 2317.421 provides that "a written bill or statement, or any relevant portion thereof" establishes a presumption of the reasonableness of medical charges and fees. At a minimum, the bills and statements must reflect the date of service, the type of service rendered, and the original charge.

{¶ 94} The statute refers to "a written bill or statement, or any relevant portion thereof." The phrase "any relevant portion thereof" broadens the meaning of the words "bill or statement" and reflects that the General Assembly intended the statute to encompass more than just charges. Moreover, there is no language in R.C. 2317.421 that excludes write-offs from the statutory presumption. Finally, the statute refers to "the party offering" the bills and statements, which means that the statutory presumption applies to either party, not just to plaintiffs. As we explained in *Robinson*, that language plainly permits plaintiffs to offer the statements to prove that the reasonable value of the medical services is equal to the charges. And we explained in *Jaques* that defendants may offer evidence of write-offs to prove that the reasonable value of the medical services is equal to the

amount paid after write-offs. There is no basis for requiring expert-witness testimony that the actual amounts charged for medical services are reasonable, when the initial charges for the services are admissible into evidence without such testimony. Eliminating the need for expert testimony allows both parties to avoid the expense and "the usually empty ceremonial" of expert testimony on reasonableness. *De Tunno,* 166 Ohio St. at 377, 143 N.E.2d 301 (Bell, J., concurring). Thus, we conclude that R.C. 2317.421 obviates the necessity of expert testimony for the admission of evidence of write-offs, reflected on medical bills and statements, as prima facie evidence of the reasonable value of medical services.

{¶ 95} The write-offs at issue here were reflected on the statements from Mr. Moretz's health-care providers. They were, therefore, a "relevant portion" of the statements, which Dr. Muakkassa was entitled to have admitted without an expert's testimony. Accordingly, on remand, Dr. Muakkassa shall be permitted to argue that the reasonable value of Mr. Moretz's medical services is the amount equal to the amount paid after write-offs without supporting that argument with expert testimony.

CONCLUSION

{¶ 96} The trial court's order granting the Moretzes leave to file a transcript of a videotaped deposition even though the filing conflicted with Civ.R. 32(A) was harmless error given the facts of this case. However, the trial court did abuse its discretion when it admitted as an exhibit an illustration from a learned treatise offered by the Moretzes, refused to submit to the jury a properly drafted interrogatory offered by Dr. Muakkassa, and prohibited Dr. Muakkassa from presenting evidence of write-offs to contest the Moretzes' medical bills without a foundation of expert testimony on the reasonable value of the medical services rendered. We further hold that these errors deprived Dr. Muakkassa of a fair trial.

Accordingly, we reverse the judgment of the Ninth District Court of Appeals, and we remand this case to the trial court for a new trial.

Judgment reversed
and cause remanded.

O'DONNELL, LANZINGER, KENNEDY, and FRENCH, JJ., concur.

PFEIFER and O'NEILL, JJ., dissent.

_____

**PFEIFER, J., dissenting.**

{¶ 97} Most farms look pretty good when viewed from afar.  The rows of crops appear evenly spaced and the barn well painted.  The view from the ground is very different.  Due to weather, the crops may be uneven or sparse and the paint on the barn may be peeling.  But, even with these imperfections, the farms are productive.  Unfortunately, the majority opinion in this case gets so caught up in the imperfect ground view that it overlooks the larger realities.  Viewed from the proper perspective, the verdict in this case is both justified and reasonable.  Moreover, by focusing on the motes, the majority opinion has attacked the trial court and the court of appeals in a way that is unwarranted and just plain demeaning.

{¶ 98} This case involves a civil trial where the burden of persuasion is on the plaintiffs to establish their case by a preponderance of the evidence.  *Merrick v. Ditzler*, 91 Ohio St.256, 260, 110 N.E. 493 (1915).  In a criminal trial, a defendant is "presumed innocent until proven guilty beyond a reasonable doubt."  R.C. 2901.05(A).  The criminal standard is tougher because "the state has a more jealous concern for the lives and liberties of its inhabitants than it can possibly entertain for property rights."  *Merrick* at 261.  The majority opinion turns these standards on their heads by essentially determining that any error in a civil trial justifies sending the case back for a new trial.  That is not the standard in criminal

32

trials, even trials where a person's life is at stake, and it certainly should not be the standard in civil trials.

{¶ 99} In criminal cases, we routinely overlook errors that are not outcome-determinative, even errors that are constitutional in nature. *Grundy v. Dhillon*, 120 Ohio St.3d 415, 2008-Ohio-6324, 900 N.E.2d 153, ¶ 27-30; *State v. Jones*, 90 Ohio St.3d 403, 422, 739 N.E.2d 300 (2000). Civ.R. 61 embodies this concept in the civil context. It states that reviewing courts must disregard errors and defects that do "not affect the substantial rights of the parties." It also provides that verdicts will not be vacated unless refusal to vacate would be "inconsistent with substantial justice." This rule and our consistent practice through the years reflect the reality that there is " 'no such thing as an error-free, perfect trial, and * * * the Constitution does not guarantee such a trial.' " (Ellipsis sic.) *State v. Hill*, 75 Ohio St.3d 195, 212, 661 N.E.2d 1068 (1996), quoting *United States v. Hasting*, 461 U.S. 499, 508-509, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983).

{¶ 100} A structural error is one that affects " ' "the framework within which the trial proceeds, rather than simply [being] an error in the trial process itself." ' " *State v. Perry*, 101 Ohio St.3d 118, 2004-Ohio-297, 802 N.E.2d 643, ¶ 17, quoting *State v. Fisher,* 99 Ohio St.3d 127, 2003-Ohio-2761, 789 N.E.2d 222, ¶ 9, quoting *Arizona v. Fulminante*, 499 U.S. 279, 310, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). *See also Beard v. Meridia Huron Hosp.*, 106 Ohio St.3d 237, 2005-Ohio-4787, 834 N.E.2d 323, ¶ 35 ("An improper evidentiary ruling constitutes reversible error only when the error affects the substantial rights of the adverse party or the ruling is inconsistent with substantial justice").

{¶ 101} Against this backdrop, it is time to examine the errors that the majority opinion concludes justify setting aside the jury verdict in this case.

*Medical Illustration from a Learned Treatise*

{¶ 102} First, it is obvious that the majority opinion correctly concludes that the trial court erred when it granted the Moretzes' motion to admit as an exhibit a medical illustration from a learned treatise. The question thus becomes whether the introduction of the illustration as an exhibit affected the framework of the trial. Clearly, it did not.

{¶ 103} The majority opinion places great weight on this illustration, imbuing it with the power to contort the jury's deliberations. But there is no reason to think that that is what happened. The trial lasted four days and produced nearly 700 pages of transcript. The illustration is discussed on fewer than ten pages of the transcript. It was offered as a representative of the type of cyst that Moretz had, and it was authenticated by Dr. Mark R. McLaughlin, one of the defense's expert witnesses. Its use during the trial was fine; only its introduction as an exhibit was improper.

{¶ 104} Dr. McLaughlin, when discussing the illustration, stated that nerves can occur on an anterior sacral meningocele and that "a neurenteric cyst can look very similar to" an anterior sacral meningocele. Dr. McLaughlin stated that nerve roots stretched over the sac "can occur," indicating the possibility of nerves, not the reality or the certainty. Similarly, in closing argument, the Moretzes' counsel stated that the illustration depicts a cyst that "potentially had nerve roots stretched over it." Defense counsel chose not to mention the illustration in closing, perhaps not wanting to draw the jury's attention to it. But the Moretzes' counsel already had referred to it, and if defense counsel thought that the illustration was particularly damaging, he could have explained to the jury why it was misleading or misrepresentative.

{¶ 105} The majority opinion attaches significance to the Moretzes' counsel referring to the illustration and stating, "That has nerves in it." But the defense's own expert witness had testified, when discussing the illustration, that

nerves like that "can occur." Furthermore, the jury knew that the illustration was just that—"an illustration" of a representative cyst. They knew that it was not intended to depict the cyst in Larry Moretz's body.

{¶ 106} There is no reason to believe that admitting the illustration as an exhibit led the jury astray. There was ample evidence presented throughout the trial that Dr. Muakkassa did not conduct himself during the surgery as Larry Moretz thought he would, did not conduct himself as Dr. Williams thought he would, did not conduct himself as Dr. McLaughlin would have conducted himself, and did not conduct himself as Dr. Dennis thought he should. That is the evidence that led to the jury verdict, not the incidental, though plainly improper, introduction of a properly authenticated illustration as an exhibit.

{¶ 107} Larry Moretz thought that Dr. Muakkassa would be the co-surgeon, not just an interested academic observer. Dr. Williams also thought that Dr. Muakkassa would be the co-surgeon, and he testified that he asked Dr. Muakkassa to scrub in, which Dr. Muakkassa did not do. Dr. McLaughlin testified that he would have used magnification to search for nerves, that he would have used stimulation to check for nerves, and that he would have scrubbed in. Dr. Muakkassa did none of those things. As the majority opinion states:

> Dr. Dennis testified that Dr. Muakkassa breached the standard of care in four ways: (1) he failed to scrub in to the surgery and operate himself, (2) he failed to use magnification or recommend that Dr. Williams use it, (3) he failed to use stimulation or recommend that Dr. Williams use it, and (4) he failed to recommend a posterior approach.

Majority opinion at ¶ 81.

{¶ 108} Against this evidence, the majority opinion concludes that the admission of the illustration as an exhibit was so overwhelmingly prejudicial that it "deprived Dr. Muakkassa of his right to a fair jury deliberation." That is nonsense. To reiterate: use of the illustration did not violate the rules of evidence. The illustration itself was relevant and properly authenticated. Only the admission of the illustration as an exhibit was against the rules.

{¶ 109} And the jury had ample other evidence from which to reach a verdict of negligence. The defense's expert witness testified that the best way to remove the cyst was with posterior surgery. Dr. Muakkassa was asked whether he made any attempt to protect the nervous system. He replied that he had not. He also testified that he didn't look to see whether there was a nerve on the cyst and that he didn't look for a nerve because he didn't expect to see one. Against all of this, the majority opinion suggests that the admission of a properly authenticated illustration as an exhibit deprived Dr. Muakkassa of a fair trial.

{¶ 110} That brings us to the standard of review on this issue, which is abuse of discretion. The majority opinion concludes that the trial court abused its discretion in allowing the illustration to be admitted as an exhibit. Accordingly, a majority of this court believes that the trial court acted unreasonably, arbitrarily, or unconscionably, though it does not tell us which. I conclude that admitting the illustration as an exhibit was not within the discretion of the court, but rather was error, mere error, and that given the abundance of other evidence presented in support of the verdict, the error was harmless.

*Proposed Interrogatory*

{¶ 111} Do we not ask enough of our juries in complicated medical-malpractice cases? They are already asked to learn obscure terminology and complex concepts that are not part of their day-to-day world. They are asked to make fine factual distinctions between reasonable options that have been explained, often inconsistently, by counsel and by witnesses. They are asked to

absorb lengthy testimony, some of which they are supposed to assume they didn't hear, such as after an objection is sustained. They are asked to live for a day, a week, or a month in an unfamiliar legal environment. We should all be very thankful for their efforts and impressed with the results they produce. But now, a majority of this court would have the juries of this state become essay writers. There is no other way to describe requiring juries to answer open-ended interrogatories. And there is no better way to induce innocent mistakes on the part of laypeople.

{¶ 112} The better practice in this case would have been for the defense to submit a yes/no question as to each issue that the plaintiffs contend was negligence. That tactic would have adequately tested the verdict without requiring the jury to write an essay on a topic with which it is generally unfamiliar. Open-ended prose answers from juries could be a gold mine for disgruntled defendants. Juries would likely make technical misstatements that could lead to reversals, even when the jury is justifiably convinced that negligence occurred.

{¶ 113} In this case, the defense submitted an open-ended interrogatory. The trial court concluded that the plaintiffs' case essentially boiled down to one issue: whether Dr. Muakkassa was negligent in failing to scrub in. It is certainly arguable that there was more than one respect in which Dr. Muakkassa could have been deemed negligent. We do not know the logic that animated the trial court's decision not to allow the proposed interrogatory, other than what was stated. But I believe that the trial court wished to avoid requiring the jury to expound in writing on a complex issue of medical care on which even the experts differed. Unfortunately, a majority of this court appears to think that that is a grand idea.

{¶ 114} The court of appeals agreed with the trial court that the basic theory of the plaintiffs' case was that Dr. Muakkassa was negligent in failing to scrub in. 2012-Ohio-1177, ¶ 16. I'm not sure I agree with that conclusion, but it

was not unreasonable. Even if we disagree with that characterization of the case, even if we would have decided differently, that does not mean that the decision should be reversed. It can only be reversed if the trial court acted unreasonably, arbitrarily, or unconscionably. It did not.

{¶ 115} One more aspect of this issue is interesting. The defense did not submit an alternative interrogatory, though they had ample opportunity. They should have submitted several: one yes/no question as to each aspect of the plaintiffs' case that in defense counsel's view constituted an allegation of negligence. Such straightforward interrogatories would have been relatively simple for the jury to answer without delving into complicated language and issues, would have properly tested the jury's verdict, and could not have been reasonably rejected by the trial court.

{¶ 116} A trial court's decision to submit interrogatories is reviewed under an abuse-of-discretion standard. *Freeman v. Norfolk*, 69 Ohio St.3d 611, 614, 635 N.E.2d 310 (1994). I conclude that the trial court did not act unreasonably, arbitrarily, or unconscionably in rejecting the proposed interrogatory. I further conclude that the defense waived its right to complain when it failed to submit alternative interrogatories.

{¶ 117} By allowing open-ended questions to be asked of juries, Civ.R. 49(B) causes more harm than good. It allows defendants to attempt to confuse or distract juries, often on minor points that have little or no bearing on the outcome and the issues they are to decide. The only thing saving the civil-justice system from daily train wrecks caused by a literal reading of Civ.R. 49(B) is the common sense and wisdom of trial judges who reject interrogatories that are designed to confuse or distract. This court should have the sense to affirm trial courts when they so act, especially when, as here, the defense had the alternative of asking straightforward yes/no questions that were unlikely to confuse or distract the jury.

*Damages Evidence*

**{¶ 118}** The trial court did not allow Dr. Muakkassa to introduce evidence to show that the value of the medical services at issue in this case was equal to the amount paid after write-offs were taken. The court concluded that evidence of write-offs could be introduced only through expert testimony. The majority opinion deems this approach an abuse of discretion, even though it calls the question an "open" one. Majority opinion at ¶ 92.

**{¶ 119}** The Moretzes introduced evidence of medical expenses by supplying copies of medical bills to opposing counsel and to the court. Dr. Dennis also testified as to the necessity and reasonableness of the treatment and medical bills. Accordingly, these medical bills are presumed to be reasonable. R.C. 2317.421. When Dr. Muakkassa attempted to present evidence of write-offs, the trial court refused because he did not have expert testimony in support of his evidence. The court stated that "assuming you have expert testimony available to support the reasonableness of that, then you can present the evidence." This approach by the trial court does not strike me as unreasonable, arbitrary, or unconscionable.

**{¶ 120}** During the trial, the defense had ample opportunity to introduce evidence about the reasonableness of the write-offs. But when Joanne Smith, a medical-billing specialist, was on the stand, the defense did not ask a single question about the medical bills in question. Instead, he focused his questions on the bill that Dr. Muakkassa presented for his services. The defense did not question Dr. Dennis or Dr. McLaughlin about the write-offs. Given that the defense did not proffer evidence of the reasonableness of the write-offs at trial, I conclude that the defense should be precluded from contesting that issue on appeal.

**{¶ 121}** The majority opinion concludes that the trial court abused its discretion in refusing to allow evidence of write-offs. Even if that were true, this

error on the part of the trial court does not necessitate a new trial because it can be easily corrected with a remittitur.

*Conclusion*

{¶ 122} Larry Moretz has a permanent loss of bowel, bladder, and sexual function. His condition is inarguably the result of the surgery he underwent. Whether Dr. Muakkassa was negligent was an issue for the jury to determine. It had ample evidence before it that he had not been negligent and ample evidence that he had been negligent. It concluded that he had been negligent.

{¶ 123} The last thing defense counsel told the jury was "I trust this system. And I will accept your verdict, as will my client * * *." After deciding that the best way to treat his patient was a drive-by surgery and after vowing to abide by the jury verdict, Dr. Muakkassa now declares that justice demands that he receive a new trial, a new opportunity to convince a fresh jury that the horrendous outcome in this case should be laid at the doorstep of his colleague, the general surgeon to whom he referred Moretz. And this court is sanctioning it, transmogrifying a couple of minor discretionary decisions that did not affect the outcome of the trial into a miscarriage of justice.

{¶ 124} The jury verdict in this case was proper. The finding of negligence and the amount of damages do not reflect passion and prejudice. Nothing in the jury verdict suggests that Dr. Muakkassa did not receive substantial justice. In short, the jury got it right, and its verdict is not "inconsistent with substantial justice" within the meaning of Civ.R. 61. The trial court's rulings were appropriate, any error was harmless under the circumstances, and the court of appeals should be affirmed, not chastised.

{¶ 125} We have stated many times that criminal defendants are entitled to a fair trial, not a perfect trial. A fair reading of the majority opinion leaves one with the unmistakable impression that from this day forward a doctor in a medical-malpractice case is entitled to a perfect trial.

**{¶ 126}** I dissent.

O'NEILL, J., concurs in the foregoing opinion.

_____

Mark D. Amaddio Co., L.P.A., and Mark D. Amaddio; and David M. Todaro Co., L.P.A., and David M. Todaro, for appellees.

Roetzel & Andress, L.P.A., Douglas G. Leak, and Stacy Delgros, for appellant.

Bricker & Eckler L.L.P., Anne Marie Sferra, and Keesha Warmsby, urging reversal for amici curiae American Insurance Association, Ohio Alliance for Civil Justice, Ohio Hospital Association, Ohio Osteopathic Association, and Ohio State Medical Association.

Dinkler Pregon, L.L.C., Jamey T. Pregon, and Lynnette Dinkler, urging reversal for amicus curiae Ohio Association of Civil Trial Attorneys.

Vorys, Sater, Seymour & Pease, L.L.P., Thomas E. Szykowny, and Michael Thomas, urging reversal for amici curiae Ohio Insurance Institute and Property and Casualty Insurance Association of America.

Traska Law Firm, L.L.C., and Peter D. Traska; and Frank A. Ray Co., L.P.A., and Frank A. Ray, urging affirmance for amicus curiae Ohio Association for Justice.

Rhonda Davis & Assoc., L.L.C., and Rhonda Gail Davis; Jacquenette S. Corgan; Susan J. Lax Law Office and Susan Lax; and Bartek Law Office and Natalie Niese, urging affirmance for amicus curiae Summit County Association for Justice.

_____