[Cite as *Snowden v. Ekeh*, 2016-Ohio-4976.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| EUGENIA A. SNOWDEN, et al. | : | |
| | : | |
| *Plaintiffs-Appellees/Cross-Appellants* | : | Appellate Case No. 26688 |
| | : | |
| | : | Trial Court Case No. 2010-CV-2890 |
| v. | : | |
| | : | (Civil Appeal from |
| AKPOFURE P. EKEH, M.D., et al. | : | Common Pleas Court) |
| | : | |
| *Defendants-Appellants/Cross-Appellees* | : | |

. . . . . . . . . .

O P I N I O N

Rendered on the 15th day of July, 2016.

. . . . . . . . . .

GARY J. LEPPLA, Atty. Reg. No. 0017172, PHILIP J. LEPPLA, Atty. Reg. No. 0089075, 2100 South Patterson Boulevard, Dayton, Ohio 45409-0612
 Attorneys for Plaintiffs-Appellees/Cross-Appellants

FREDERICK A. SEWARDS, Atty. Reg. No. 0046647, SABRINA S. SELLERS, Atty. Reg. No. 0090558, 300 East Broad Street, Suite 350, Columbus, Ohio 43215
 Attorneys for Defendants-Appellants/Cross-Appellees

. . . . . . . . . . . .

WELBAUM, J.

{¶ 1} Defendant-Appellant, Wright State Physicians, Inc., ("WSP") appeals from a decision of the trial court entered on April 15, 2015, and the Court's Final Judgment, entered on April 20, 2015. Plaintiffs-Appellees and Cross-Appellants, the Estate of Eugenia Snowden and Dennis Snowden (collectively, "Snowdens"), cross-appeal from the trial court's decision of April 15, 2015, the Final Judgment of April 20, 2015, and the jury verdict, which was rendered on July 19, 2014, and filed on July 22, 2014.

{¶ 2} In support of its appeal, WSP contends that the trial court erred in refusing to allow production of a settlement agreement between the Snowdens and other co-defendants. WSP also contends that the trial court erred in refusing to set-off the amount of the jury verdict from the amount of the settlement agreement.

{¶ 3} In their cross appeal, the Snowdens contend that the trial court erred in various respects, including: failing to grant motions for directed verdict and judgment notwithstanding the verdict ("jnov"); in submitting erroneous interrogatories to the jury; in permitting WSP to use an affidavit of merit as evidence and for impeachment; in allowing WSP's counsel to improperly lead its expert witness during cross-examination; in preventing the Snowdens from discussing the timing of WSP's admission of liability; and in committing numerous other evidentiary errors.

{¶ 4} We conclude that error prejudicial to the Snowdens occurred in several respects at the trial court level, and that the jury verdict must be reversed. In view of this decision, this cause will be remanded for a new trial, and WSP's assignments of error will be overruled, as moot. However, in the event of a judgment in the Snowdens' favor on remand, the trial court will permit the settlement agreement to be filed under seal, and will

determine any set-off to be applied, based on the content of the settlement agreement and the application of R.C. 2307.28.

## I. Facts and Course of Proceedings

{¶ 5} This case is a medical malpractice action involving the care and treatment of Eugenia Snowden, who died in May 2010 due to complications from numerous bowel surgeries. Eugenia Snowden ("Gina") was hospitalized between October 2008 and May 2010 at both Miami Valley Hospital ("MVH") and the Cleveland Clinic. Her first surgery (as relevant to this case) occurred at MVH on October 27, 2008. The operating surgeon was Dr. Peter Ekeh, who was named as a defendant in this action.

{¶ 6} The October 27, 2008 surgery was an exploratory laparoscopy. At that point, Gina had severe colon inertia, in that she was having a bowel movement once every other week. Medications designed to assist her had not worked. Gina had extensive adhesions and scarring, and when Dr. Ekeh attempted to loosen the bowel from the scarring, he caused accidental enterotomies (holes) in the bowel. This was not negligent and can happen in these types of surgery, which are akin to peeling a stamp from an envelope. There was a dead spot in the colon, and Dr. Ekeh removed part of the colon and hooked the small intestine to the sigmoid colon.

{¶ 7} After this surgery, Gina developed an anastomotic leak (or a leak at the site where the colon and small intestine had been connected). As a result, bowel content was leaking into her abdomen. This resulted in further surgery by Dr. Ekeh on November 11, 2008. At the November 11, 2008 surgery, Dr. Ekeh decided to disconnect the connection between the small intestine and colon, and form an ileostomy, or bag, to drain

and control Gina's intestinal contents.

{¶ 8} Multiple further surgeries occurred at MVH in November 2008, during which Dr. Ekeh attempted to fix the holes in the bowel, which would break down after the surgeries and start leaking bowel content into the abdomen. The large amount of infection from the anastomotic leak created a hostile environment that would not allow the holes in the small bowel to heal. Eventually, Dr. Ekeh decided to stop and let Gina heal from the infection for three months. He would then try again to hook up the colon and intestines.

{¶ 9} On February 26-27, 2009, a 17-hour surgery occurred at MVH. Dr. Ekeh again was the surgeon. Prior to the surgery, Gina had developed multiple fistulas, which are abnormal connections between two body parts. In this case, the fistulas were between the small bowel intestine and the skin, so bowel contents were leaking out onto the skin. During this procedure, Dr. Ekeh again made at least two accidental holes in the bowel while attempting to take down adhesions. That, and the need to separate the parts of the intestine, caused further re-sectioning and removal of parts of the intestine. At the end of this procedure, Gina had only about 80 to 90 centimeters of the small bowel left. According to most of the experts, 90 centimeters is the minimum amount of bowel needed; otherwise the patient will need either TPN (intravenous feeding) for the rest of his or her life, or a bowel transplant. This amount of bowel equates to 2 to 3 feet, whereas a normal small bowel is 10 to 15 feet long.

{¶ 10} During the February 26-27, 2009 procedure, Dr. Ekeh left a surgical sponge in the left upper quadrant of Gina's abdomen. Sponges are actually more like towels, measuring about 7.4 inches long by 3.14 inches wide by .19 inches thick. They can be

used for separating parts of the body during surgery, or to absorb liquids. The nurses and scrub techs initially informed Dr. Ekeh that the sponge count was off by one sponge. As a result, an intraoperative x-ray was taken. Dr. Ekeh then located a sponge and removed it. However, the x-ray showed that two sponges had been left in the body.

{¶ 11} Dr. Ekeh completed the surgery without checking the x-ray, talking to the radiologist, or reviewing the report. He never reviewed the x-ray report until mid-April 2009, when an upper GI series that was done revealed a retained sponge. The unanimous expert opinion was that this was a departure from the standard of care, and WSP (Dr. Ekeh's employer and the only remaining defendant at trial), eventually stipulated this right before trial.

{¶ 12} If the sponge had been discovered at the time of surgery or within a week or two after surgery, it could have been easily removed. Multiple further surgeries occurred in March and April 2009. These surgeries were not done in connection with the sponge. Gina had developed another fistula, and there was heavy output from it. Dr. Ekeh attempted various measures to control and close the fistula, like a skin graft, putting on mesh, and eventually, using AlloDerm, which is a biologic form of mesh. However, he was unsuccessful.

{¶ 13} After Dr. Ekeh became aware of the retained sponge, he discussed it with Gina and her husband, Dennis. He indicated that the sponge was not causing problems at the time. On May 12, 2009, Ekeh told the Snowdens that he wanted to send Gina up to the Cleveland Clinic, that it was time for a "new set of eyes." Gina was then transferred to the Cleveland Clinic on May 13, 2009, where she was evaluated by Dr. Remzi, a colorectal surgeon.

{¶ 14} Dr. Remzi was aware that a retained sponge was present. He wanted to wait six months to do any further operating on Gina, in order to build her up. She was then transferred back to the Dayton area, to a long-term care facility. However, she was admitted again to Miami Valley Hospital on June 6, 2009, because she had developed low grade fevers and tenderness in the left upper quadrant (which was the area where the retained sponge was located). On admission, she was found to have a collection of fluid in the upper left quadrant.

{¶ 15} Dr. Ekeh aspirated some fluid and found the presence of Vancomycin-resistant enterococcus (VRE). Due to a suspicion that the sponge was the cause of the infection, Dr. Ekeh performed surgery again on June 19, 2009. This time, Dr. Ekeh went in through Gina's flank because he did not want to risk further midline surgery. However, during this surgery, Dr. Ekeh injured Gina's spleen and she began bleeding. As a result, the surgery had to be stopped. Dr. Ekeh intentionally left four more sponges in, with the intent of coming back in subsequently to close Gina and remove the sponges. He did so on June 22, 2009, but he did not make a further physical attempt to remove the retained sponge. He did not feel it was worth the risk.

{¶ 16} Gina remained at MVH until August 28, 2009, when she was transferred to the Cleveland Clinic. The plan was to continue to build her up and give her rest, and to wait for her adhesions from the prior surgeries to soften. According to Dr. Remzi, Gina had an enterocutaneous fistula that involved her spilling bowel contents out of her intestines all the time. She also had a baseline chronic infection related to the sponge.

{¶ 17} On October 1, 2009, Dr. Remzi performed a nine-hour surgery at the Cleveland Clinic. The multiple surgeries, fistulas, and chronic infections had made the

bowel stick to itself. The small bowel was stuck in the fistula, and despite the time they had waited, the adhesions had not softened to the point where the surgery was easy or relatively less complex.

{¶ 18} During the October 2009 operation, Dr. Remzi made at least four to five holes in the intestines, due to the fact that the bowel was stuck together. After deciding that the fistula was not repairable, Dr. Remzi removed it. He also removed the sponge, drained the area, and sent the sponge to pathology. No cultures were done on the sponge, and pathology did only a gross examination of the sponge.

{¶ 19} After the surgery, Dr. Remzi consulted with Dr. Quintini about a transplant, since Gina had very little bowel left. Following surgery, Gina had complications, including development of another fistula and infections. Dr. Remzi performed two more surgeries. On October 12, 2009, he washed out the wound, addressing a large abdominal wound and infection. On October 20, 2009. Dr. Remzi drained an abdominal abscess and revised Gina's stoma (a surgical opening created in order to drain the bowel).

{¶ 20} Between December 2009 and March 2010, Snowden had various infectious problems. Several days prior to transplant surgery, she was found to be infection-free, based on a nuclear white blood cell study. Dr. Quintini successfully performed a bowel transplant on March 9, 2010. However, on March 16, 2010, Snowden began severely bleeding and was taken to emergency surgery. At that time, the transplanted bowel was removed so that the doctors could control the bleeding. By the time the bleeding was stopped, the doctors concluded that the grafted intestine was not healthy enough to put back into Gina. In addition, Gina's aorta showed signs of severe inflammation.

{¶ 21} Following the emergency surgery on March 16, 2009, Gina remained in intensive care, and she eventually died on May 7, 2010, due to multiple organ failure. Dr. Swartz, plaintiff's expert, testified that Dr. Ekeh's failure to timely discover and remove the sponge caused chronic infections, poor healing, not enough intestine to sustain life, and, ultimately, Gina's death. Dr. Cook, the defense expert, testified that there was no indication that the sponge was infected, and that the infection complications Gina had were consistent with other individuals who have a short intestine and are on chronic TPN, which suppresses the immune system. Dr. Cook further testified that the sponge did not cause Gina's death, issues with her intestinal function, or Gina's ability to take care of herself or her wound. Dr. Ekeh testified that he had negligently failed to discover the sponge, but that only the June 2009 surgeries were proximately caused by his failure to timely discover and remove the sponge.

{¶ 22} On April 6, 2010 (prior to Gina's death), Gina and her husband filed suit against Dr. Ekeh, WSP, MVH, Premier Health Partners, and various John and Jane Does, the latter of whom were described as staff and employees of Miami Valley Hospital. The answers filed by all the defendants denied the allegations with respect to the John and Jane Doe defendants.

{¶ 23} On May, 18, 2010, a notice of suggestion of death was filed, and Gina's estate was substituted as a party plaintiff. After an amended complaint was filed in June 2010, the same allegations were made regarding the John and Jane Doe defendants, and these allegations were again denied by all defendants. A second amended complaint filed on April 2, 2012, listed the nurses, scrub technicians and so on, who were allegedly negligent. Again, all defendants denied the allegations regarding the status of these

individuals as agents and/or employees of MVH. Answers were filed for these individuals on June 25, 2012, by the same attorneys who represented MVH. However, the allegations with respect to the agency or employee status of these individuals were again denied.

{¶ 24} In September 2013, the Snowdens filed a notice with the trial court, dismissing MVH, Premier Health Partners, and all individual defendants other than Dr. Ekeh. Dr. Ekeh had previously been dismissed as a defendant, due to the fact that he was civilly immune from suit and suit had to be brought against him in the court of claims. The probate application concerning the settlement was then filed in September 2013.

{¶ 25} As was noted, WSP stipulated shortly before trial that Dr. Ekeh's conduct fell below the standard of care. WSP also filed a motion in limine prior to trial, asking the court to preclude the Snowdens from commenting on the timing of the stipulation.

{¶ 26} In July 2014, the case was tried before a jury. At the end of the trial, the Snowdens moved for removal of any reference to MVH or the liability of MVH from the interrogatories because no evidence had been presented concerning the employer of the nurses and scrub technicians. The trial court overruled the motion.

{¶ 27} After hearing the evidence, the jury returned a general verdict for the Snowdens against WSP in the amount of $100,000. In response to interrogatories, the jury found that WSP's actions, through Dr. Ekeh's negligence, caused injuries to Gina Snowden. In response to interrogatory 3, the jury concluded that the "nurses, scrub technicians, and/or employees of Miami Valley Hospital negligently provided care and treatment" to Snowden. The jury did not find that WSP or any individuals proximately caused Gina's death.

{¶ 28} The jury awarded Gina Snowden $100,000 for her non-economic loss (conscious pain and suffering prior to her death). In addition, the jury awarded zero damages for loss of consortium or mental anguish to the surviving spouse and next of kin, and zero damages to the estate for economic loss prior to Gina's death.

{¶ 29} On July 21, 2014, WSP filed a motion for production of documents, asking the court to order production of the settlement documents between MVH and the Snowdens. WSP attached probate court records to the motion, which indicated that in September 2013, the probate judge had approved a magistrate's decision allocating a total sum of $275,000 as follows: $72,000 for subrogation reimbursement to Anthem; $12,069.18 to counsel for costs and expenses advanced; and $100,000 to counsel for attorney fees. The court allocated the remaining $90,430.81 to the wrongful death claim, and $0.00 to the survival claim. The net proceeds were distributed to the wrongful death beneficiaries.

{¶ 30} On July 22, 2014, the trial court filed a general verdict entry, noting the $100,000 verdict for Gina's estate. Subsequently, the Snowdens filed a motion for jnov, a motion for new trial, and a motion for relief from judgment under Civ.R. 60(B)(3) and (5). As grounds for these motions, the Snowdens raised the same arguments that are being raised in their cross-appeal.

{¶ 31} The judge who presided over the trial did not render a decision before her successor was sworn into office. On April, 15, 2015, the new judge issued a decision overruling all the pending motions. The judge then filed a judgment entry on April 20, 2015, reflecting its decision overruling the pending motions, and awarding Gina's estate $100,000 plus post-judgment interest at the statutory rate. WSP appealed, raising two

assignments of error, and the Snowdens cross-appealed, raising eight assignments of error. For purposes of convenience, we will address the assignments and cross-assignments of error out of order, beginning with the cross-assignments of error.

## II. Use of the Affidavit of Merit

{¶ 32} The Snowdens' Third Assignment of Error states that:

The Trial Court Erred, as a Matter of Law, When it Allowed Counsel

for WSPI to Use, Discuss and Show the Jury Plaintiffs' Affidavit of Merit.

{¶ 33} Under this assignment of error, the Snowdens contend that the trial court erred as a matter of law, when it allowed WSP's counsel to use the affidavit of merit of the Snowdens' expert, Dr. Swartz, during Dr. Swartz's cross-examination, and in closing argument to attack Dr. Swartz's credibility.

{¶ 34} Civ.R. 10(D)(2) provides that complaints containing medical claims must include an affidavit of merit "relative to each defendant named in the complaint for whom expert testimony is necessary to establish liability." This rule also contains certain substantive requirements for the affidavits.

{¶ 35} Consistent with the rule, the Snowdens included the affidavit of Steven Swartz, M.D., with their complaint, which was filed in April 2010, prior to Gina's death. In the affidavit, Dr. Swartz, who was a board certified physician, opined that Dr. Ekeh, and "the agents and staff of Miami Valley Hospital deviated from acceptable standards of medical practice * * * in the treatment of Eugenia Snowden and that such deviation was the proximate cause of her serious, life-threatening injuries." Doc. #1, Affidavit of Steven E. Swartz, M.D., p. 1. These averments met the bare requirements of the rule.

**{¶ 36}** The affidavit of merit was discussed during Dr. Swartz's discovery deposition. Subsequently, over Snowden's objection, the trial court allowed WSP to cross-examine Dr. Swartz at length during trial about his comments in the affidavit of merit. *See* Transcription of Video Deposition of Dr. Swartz, pp. 100-105. In addition, during closing argument, WSP's counsel referred on several occasions to the affidavit of merit to attack the credibility of Dr. Swartz. *See* Transcript of Proceedings, Vol. IV, pp. 771-772, 787, and 791-792.

**{¶ 37}** Civ.R. 10(D)(2)(d) specifically states that "[a]n affidavit of merit is required to establish the adequacy of the complaint and shall not otherwise be admissible as evidence or used for purposes of impeachment." "The affidavit of merit merely establishes the adequacy of the complaint. It does not constitute evidence in support of a plaintiff's claim, nor would the assertions therein ever be adequate to prove the merits of a medical liability claim." *White v. Summa Health Sys.*, 9th Dist. Summit No. 24283, 2008-Ohio-6790, ¶ 22.

**{¶ 38}** The same rules apply to the defense. Civ.R. 10(D)(2)(d) is explicitly clear that the affidavit *cannot be used as evidence*, *nor can it be used for impeachment*. WSP suggests that its actions were proper because Snowden's counsel referred to the affidavit during Dr. Swartz's discovery deposition or because Dr. Swartz contradicted himself. These points are irrelevant, and WSP should have been aware of the prohibition in the rule against any use of the affidavit. Accordingly, the trial court should have sustained the Snowdens' objection and should have precluded WSP from using the affidavit of merit. Furthermore, the use of the affidavit was clearly prejudicial, as WSP used it to attack Dr. Swartz's credibility, not only during cross-examination, but also during closing

argument.

**{¶ 39}** Based on the preceding discussion, the Third Assignment of Error is sustained.

### III.   Alleged Negligence of Hospital "Employees"

**{¶ 40}** The First and Second Cross-Assignments of Error are interrelated and will be discussed together.   These cross-assignments of error state that:

The Trial Court Erred, as a Matter of Law, When it Failed to Grant Plaintiffs/Appellees/Cross-Appellants Motion for a Directed Verdict and Overruled Plaintiffs' Motion for Judgment Notwithstanding the Verdict Pursuant to Civ.R. 50(B), because WSPI Failed to Establish that the Nurses and Scrub Techs Were Employees or Agents of Miami Valley Hospital.

The Trial Court Erred, as  Matter of Law, When It Permitted Jury Interrogatories, Numbers 3, 4 and 5, Referencing "Nurses, Scrub Techs, and/or Employees of Miami Valley Hospital" Despite No Evidence that the Nurses and Scrub Techs Were Employees or Agents of Miami Valley Hospital.

**{¶ 41}** These cross-assignments of error are based on the contention that WSP failed to introduce evidence at trial that the nurses and scrub techs in the operating room on February 26-27, 2009, were employees or agents of MVH.   In view of this alleged failure of proof, Snowden contends that the trial court should have granted its motion for directed verdict on the issue, and should not have submitted the issue of these parties' employment and alleged negligence to the jury.

{¶ 42} At the end of the evidence, the Snowdens asked the trial court to strike any reference to MVH or its liability in the interrogatories because there was no evidence that the nurses and scrub technicians were employed by MVH or that they had any connection with MVH, other than physically being present at the hospital at the time of surgery.  In responding, WSP argued that these individuals were included in the complaint as having been allegedly negligent and that MVH had "filed an answer corroborating that these people were, in fact, employees of Miami Valley Hospital."  Transcript of Proceedings, Vol. IV, p. 736.

{¶ 43} The trial court overruled the motion, and then submitted several interrogatories to the jury that contained statements connecting the nurses and scrub techs to MVH.  For example, Interrogatory No. 3 stated, "Do you find by the greater weight of the evidence that nurses, scrub techs, and/or employees of Miami Valley Hospital negligently provided medical care and treatment to Eugenia Snowden?  Yes ___  No ___."  *Id.* at p. 829; Doc. #I99.  The jury answered "yes" to this question.  *Id.* at Doc. #199.  Similarly, Interrogatories No. 4 and 5 asked the jury to decide if the negligence of the nurses, scrub techs, and/or employees of Miami Valley proximately caused injury to Snowden (No. 4), or proximately caused Snowden's death (No. 5).  *Id.* at p. 829-830; Doc. #200 and #201.  The jury answered "yes" concerning injury, and "no" concerning death.

{¶ 44} In the jury instructions, the trial court also instructed the jury that WSP contended that nurses, scrub techs, and/or employees of MVH who were not parties were negligent in treating Snowden.  Transcript of Proceedings, Vol. IV, p. 816.  The court went on to instruct the jury that it was to decide whether these individuals' "negligence

directly and proximately caused or contributed to cause Ms. Snowden to experience injury, conscious pain and suffering before her death * * *." *Id.* at p. 817. In addition, after discussing the standards of care for nurses and scrub techs, the court told the jury that:

It is alleged by Wright State Physicians, Incorporated that Plaintiff's injuries have been caused by the hospital's negligence. A hospital is responsible for injuries proximately caused by the negligence of its employees including nurses or scrub techs acting within the scope of their employment.

It must be proved by Defendant Wright State Physicians, Incorporated by the greater weight of the evidence that the hospital was negligent, that the hospital's negligence was a proximate cause of the Plaintiff's injuries and that the Plaintiff was damaged by the hospital's negligence.

A hospital is negligent if the hospital fails to meet the required duty of care, skill and diligence that a reasonably careful hospital offers under the same or similar circumstances, considering the level of services or skills offered by the hospital and what the hospital knew or should have known about the patient's physical condition, mental capacity and ability to care for herself.

Transcript of Proceedings, Vol. IV, pp. 818-819.

{¶ 45} As was noted, after finding that WSP, through its employee, Dr. Ekeh, had negligently caused injury to Gina Snowden, the jury awarded Gina non-economic

damages only, in the amount of $100,000. Following entry of the verdict, the Snowdens filed a motion for judgment notwithstanding the verdict, a motion for a new trial, and a motion for relief from judgment pursuant to Civ.R. 60(B)(3) and (5). In these motions, the Snowdens argued, among other things, that the trial court should have granted the motion for directed verdict because WSP failed to establish that the nurses and scrub techs were employees or agents of MVH. The Snowdens also discussed the prejudicial use of the affidavit of merit.

{¶ 46} The trial judge did not rule on the motions before leaving the bench. Ultimately, a new judge, who had not presided over the trial, overruled the motions as moot. This holding was based on the court's conclusion that the Snowdens' prior settlement should not be offset against the $100,000 jury verdict.

{¶ 47} Courts apply the same test to Civ.R. 50(A) motions for directed verdict and Civ.R. 50(B) motions for jnov. *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 25. Both motions present questions of law. *Id.*

{¶ 48} "Faced with the question of sufficiency through a directed verdict motion, the court must determine whether any evidence exists on every element of each claim or defense for which the party has the burden to go forward." *Id.*, citing *Ruta v. Breckenridge–Remy Co.*, 69 Ohio St.2d 66, 430 N.E.2d 935 (1982), paragraph one of the syllabus. "In addressing this question, we must test whether the evidence, construed most strongly in favor of appellees, is legally sufficient to sustain the verdict. * * * Because this is a question of law, it requires de novo review." (Citations omitted.) *Environmental Network Corp. v. Goodman Weiss Miller, L.L.P.*, 119 Ohio St.3d 209, 2008-Ohio-3833, 893 N.E.2d 173, ¶ 23.

{¶ 49} As a preliminary matter, we note that certain matters in pleadings may be considered in ruling on a motion for directed verdict. Specifically, in making this evaluation, a court considers " 'evidence adduced at trial and the facts established by admissions in the pleadings and in the record * * *.' " *Gladon v. Greater Cleveland Regional Transit Auth.*, 75 Ohio St.3d 312, 318, 662 N.E.2d 287 (1996), quoting *Posin v. A.B.C. Motor Court Hotel, Inc.*, 45 Ohio St.2d 271, 275, 344 N.E.2d 334 (1976). As a result, the Snowdens are not completely correct in contending that pleadings cannot be evidence. A combination of pleadings, like a complaint and an answer admitting an allegation, can be an admission. On the other hand, WSP's assertion about admissions in this case was inaccurate. In this regard, counsel for WSP represented to the court that MVH had filed an answer corroborating the fact that the nurses and scrub techs were employees. This was not true.

{¶ 50} The allegations concerning the status of these individuals as agents or employees are contained in paragraphs eight and nine of the Complaint, paragraphs eight and nine of the First Amended Complaint, and paragraphs eight and nine of the Second Amended Complaint. *See* Doc. #1, Doc. #24, and Doc. #57. The answers of all defendants, including MVH, denied these paragraphs of the complaints.[1] In fact, when the Second Amended Complaint substituted the individual nurses and scrub techs for the John and Jane Doe defendants named in the original Complaint, these defendants also

---

[1] *See* Doc. #13 (Answer of MVH, Premier Health Partners, and Wylan Peterson, M.D. to Complaint); Doc. #17 (Answer of Dr. Ekeh and WSP to Complaint); Doc. #25 (Answer of MVH, Premier Health Partners, and Peterson, M.D., to First Amended Complaint); Doc. #26 (Answer of Dr. Ekeh and WSP to First Amended Complaint); Doc. #70 (Answer of MVH, Premier Health Partners, and Peterson, M.D., to Second Amended Complaint); Doc. #74 (Answer of Dr. Ekeh and WSP to Second Amended Complaint).

denied paragraphs eight and nine, relating to their employment status. *See* Doc. #96 (Answer of individual nurses and scrub techs to Second Amended Complaint), and Doc. #103 (Answer of individual nurse, Courtney Smith). Accordingly, there were no admissions regarding the status of the named individuals. As to the remaining evidence, none of the nurses or scrub techs testified, nor was there any testimony from any representatives of MVH. The only other reference to the nurses and staff as pertaining to their status at MVH occurred during the cross-examination of Dr. Swartz, when he was questioned about the statements in his affidavit of merit. To the extent that this was used as evidence, it was improper, for the reasons already noted, and Dr. Swartz's testimony could not serve as proof bearing on the question of whether the nurses and scrub techs were employees or agents of MVH.

{¶ 51} WSP argues that the issue of whether the nurses and scrub techs were employed by MVH is irrelevant, because WSP was not required to demonstrate that MVH was vicariously liable in order to set-off the amounts that MVH paid under the settlement agreement. WSP also argues that it did not have a burden to establish apportionment because it did not request apportionment. In addition, WSP argues that, in contrast to prior statutes on the subject, R.C. 2307.28 does not require that a settling party be found liable in tort in order for set-off to be applied.

{¶ 52} As a preliminary matter, we note that WSP asked for jury instructions that would determine that others were negligent and had proximately caused the injury or death of Gina Snowden. S*ee* Doc. #185, pp. 8 and 10-11, and proposed Interrogatories Nos. 3, 4, and 5. These proposed instructions and interrogatories specifically linked the nurses and MVH.

{¶ 53} "In order to establish medical malpractice, it must be shown by a preponderance of evidence that the injury complained of was caused by the doing of some particular thing or things that a physician or surgeon of ordinary skill, care and diligence would not have done under like or similar conditions or circumstances, or by the failure or omission to do some particular thing or things that such a physician or surgeon would have done under like or similar conditions and circumstances, and that the injury complained of was the direct and proximate result of such doing or failing to do some one or more of such particular things." *Bruni v. Tatsumi*, 46 Ohio St.2d 127, 346 N.E.2d 673 (1976), paragraph one of the syllabus.

{¶ 54} " 'Defendants can avoid a directed verdict on the subject [of whether the negligent act of another proximately caused an injury] through cross-examination, presentation of contrary evidence that the negligence was not the probable cause of the injury, or presenting evidence of alternative causes of the injury.' " *Ward v. Govt. Emps. Ins. Co.*, 2d Dist. Montgomery No. 24884, 2012-Ohio-2970, ¶ 19, quoting *Werth v. Davies*, 120 Ohio App.3d 563, 570, 698 N.E.2d 507 (1st. Dist.1997). (Other citation omitted.) As a result, whether or not WSP would eventually be entitled to a set-off is irrelevant to what WSP was required to prove at trial to avoid a directed verdict on whether the Snowdens' injuries were proximately caused by others.

{¶ 55} Furthermore, WSP is incorrect to the extent its argument is based on the theory that it could obtain the benefit of a settlement where another party would not even be potentially liable in tort. R.C. 2307.28 states that:

When a release or a covenant not to sue or not to enforce judgment is given in good faith to one of two or more persons for the same injury or

loss to person or property or the same wrongful death, both of the following apply:

(A) The release or covenant does not discharge any of the other tortfeasors from liability for the injury, loss, or wrongful death unless its terms otherwise provide, but it reduces the claim against the other tortfeasors to the extent of the greater of any amount stipulated by the release or the covenant or the amount of the consideration paid for it, except that the reduction of the claim against the other tortfeasors shall not apply in any case in which the reduction results in the plaintiff recovering less than the total amount of the plaintiff's compensatory damages awarded by the trier of fact and except that in any case in which the reduction does not apply the plaintiff shall not recover more than the total amount of the plaintiff's compensatory damages awarded by the trier of fact.

(B) The release or covenant discharges the person to whom it is given from all liability for contribution to any other tortfeasor.

{¶ 56} By referring to "other tortfeasors," the statute necessarily implies that the party obtaining the release would have been potentially liable in tort. "A 'joint tortfeasor' has been defined as one who actively participates, cooperates in, requests, aids, encourages, ratifies, or adopts a wrongdoer's actions in pursuance of a common plan or design to commit a tortious act." *Clevecon, Inc. v. Northeast Ohio Regional Sewer Dist.*, 90 Ohio App.3d 215, 223, 628 N.E.2d 143 (8th Dist.1993), quoting Prosser, *Law of Torts* Section 46, at 292 (4 Ed.1978). *Accord Burns v. Burns Iron & Metal Co.*, 6th Dist. Sandusky No. S-12-024, 2013-Ohio-2024, ¶ 26, fn.1. In addition, " 'concurrent

negligence is defined as consisting : "of the negligence of two or more persons concurring, not necessarily in point of time, but in point of consequence, in producing a single indivisible injury." ' " *Baeder v. Szaller*, 3d Dist. Seneca No. 13-88-31, 1991 WL 11235, *2 (Jan. 30, 1991), quoting *Davis, Admr. v. Lanesky*, 91 Ohio App. 125, 129, 107 N.E.2d 919 (8th Dist. 1951).

{¶ 57} Prior to the time the contribution statutes in Ohio were revised and re-codified in 2003, the Supreme Court of Ohio had held that under former R.C. 2307.32(F) [then R.C. 2307.33(F)], a defendant would only be entitled to set-off settlement funds from a co-defendant "where there is a determination that the settling co-defendant is a person 'liable in tort.' " *Fidelholtz v. Peller*, 81 Ohio St.3d 197, 198, 690 N.E.2d 502 (1998), syllabus. At that time, the statute provided for a reduction "[w]hen a release or a covenant not to sue or not to enforce judgment is given in good faith to one of two or more persons *liable in tort* for the same injury or loss to person * * *." (Emphasis sic.) *Id.* at 200, quoting R.C. 2307.32(F). The court noted that it had previously construed "liable in tort" in the context of R.C. 2307.31(A) "to mean that the contribution defendant must have acted tortiously and thereby caused damages." *Id.* at 202, citing *MetroHealth Med. Ctr. v. Hoffmann–LaRoche, Inc.*, 80 Ohio St.3d 212, 215, 685 N.E.2d 529 (1997).

{¶ 58} In *Fidelholtz*, the Supreme Court of Ohio concluded that because it had defined this term ("liable in tort") in one part of the Contribution Among Tortfeasors Act, it was required to accord the same definition to other parts of the Act. *Id.* Accordingly, the court rejected automatic set-off, and held that set-off would apply only when the settling co-defendant was "liable in tort" following "a jury finding, a judicial adjudication, stipulations of the parties, or the release language itself * * *." *Id.* at 203. What this

meant is that unless one of these situations applied, a defendant was not entitled to offset other funds the plaintiff had received, and the plaintiff could recover more than 100% in damages.

{¶ 59} Subsequently, we concluded that *Fidelholtz* had partially abrogated the common law rule of " 'single satisfaction,' " by engaging in "an unconventional interpretation of former R.C. 2307.32(F), which is now R.C. 2307.33(F)." *In re Miamisburg Train Derailment Litigation*, 132 Ohio App.3d 571, 583-584, 725 N.E.2d 738 (2d Dist.1999), citing *Fidelholtz* at 202-203. We discussed ways in which this interpretation posed difficulties for trial courts and litigants, and suggested various methods of determining a settling party's fault. *Id.* at 585-588. We recognized, however, that we were required to follow *Fidelholtz*. *Id.* at 583.

{¶ 60} In 2003, the legislature repealed various statutes pertaining to contribution and set-off, and enacted new statutes. *See* S.B. 120, Section 1, 2002 Ohio Laws 240, effective April 9, 2003. The new statute pertaining to set-off, R.C. 2307.28, no longer contained the words "liable in tort." As a result, we agree that WSP was not necessarily required to establish that MVH was "liable in tort" under one of the methods established in *Fidelholtz* in order to obtain set-off of funds. However, some connection would be required; otherwise, a party could demand that set-off be applied to strangers to a transaction or event. Again, however, this was not particularly relevant to what occurred at trial.

{¶ 61} As was noted, WSP introduced the employment relationship and MVH's alleged negligence into the jury instructions when no evidence had been presented on these points. In fact, the trial court discussed the standard of care of hospitals and

MVH's potential negligence in deviating from these standards when no evidence at all had been presented on these points.

{¶ 62} WSP was entitled to provide evidence of alternate theories of causation in order to avoid having a directed verdict granted against it. However, the way in which this occurred, with the error in instructions, would have been unnecessarily confusing to the jury, and was, therefore, prejudicial to Snowden. In addition, we note that Dr. Cook (the defense expert) indicated that even though the nurses had reported an incorrect sponge count, any culpability would have been obviated by a review of the x-ray. Transcript of Proceedings, Vol. III, p. 519.

{¶ 63} In view of the substantial confusion introduced into the trial, the judgment of the trial court must be reversed, and this cause must be remanded for a new trial.

{¶ 64} Based on the preceding discussion, the First Cross-Assignment of Error is overruled, and the Second Cross-Assignment of Error (pertaining to the interrogatories) is sustained.

IV.  Motions for New Trial and for Relief from Judgment

{¶ 65} Snowden's Fourth Cross-Assignment of Error states that:

The Trial Court Erred, as a Matter of Law, When It Overruled Plaintiffs' Motions Pursuant to Civ.R. 59(A) and Civ.R. 60.

{¶ 66} Under this cross-assignment of error, the Snowdens contend that the trial court should have granted the motion for new trial based on Civ.R. 59(A)(1), (2), (4), (7), and (9). The Snowdens have not presented any discussion about the application of Civ.R. 60.

{¶ 67} As pertinent, Civ.R. 59(A) provides that a new trial may be granted for the following reasons:

(1) Irregularity in the proceedings of the court, jury, magistrate, or prevailing party, or any order of the court or magistrate, or abuse of discretion, by which an aggrieved party was prevented from having a fair trial;

(2) Misconduct of the jury or prevailing party;

* * *

(4) Excessive or inadequate damages, appearing to have been given under the influence of passion or prejudice;

* * *

(7) The judgment is contrary to law;

* * *

(9) Error of law occurring at the trial and brought to the attention of the trial court by the party making the application.

{¶ 68} We review trial court decisions on motions for new trial for abuse of discretion, which "is shown when a decision is unreasonable; that is, when there is no sound reasoning process that would support the decision." *Drehmer v. Fylak*, 163 Ohio App.3d 248, 2005-Ohio-4732, 837 N.E.2d 802, ¶ 8 (2d Dist.), citing *AAAA Ent., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990).

{¶ 69} As was noted, the trial court did not rule on the motion for new trial or the motion for relief from judgment. Instead, the court concluded that the motions were moot

in view of its decision on set-off. Under this assignment of error, Snowden has not presented any specific supporting arguments, and we refuse to guess at his intended points. In any event, we have already determined that a new trial is warranted. Accordingly, the Fourth Cross-Assignment of Error is overruled.

## V. Use of Leading Questions

{¶ 70} The Snowdens' Fifth Cross-Assignment of Error states that:

The Trial Court Erred, as a Matter of Law, When It Allowed Counsel for Defendant WSPI to Repeatedly Lead Defendant's Expert Witness on Direct Examination.

{¶ 71} Under this assignment of error, the Snowdens contend that the trial court erred by allowing WSP to repeatedly lead its expert during cross-examination. In support of this argument, the Snowdens recite various situations where WSP asked leading questions of its expert witness.

{¶ 72} Evid. R. 611(C) provides that "[l]eading questions should not be used on the direct examination of a witness except as may be necessary to develop the witness' testimony." Nonetheless, a trial court may permit this form of questioning in its sound discretion. (Citations omitted.) *Lambert v. Shearer*, 84 Ohio App.3d 266, 275, 616 N.E.2d 965 (10th Dist.1992). "By the restriction on leading questions the law seeks to encourage honest, narrative answers as opposed to positions put forth by counsel." (Citation omitted.) *Id.* at 276.

{¶ 73} We have reviewed the entirety of the transcript and it is true that counsel for WSP tended to unnecessarily ask leading questions. However, we cannot find that this,

in and of itself, was prejudicial. Furthermore, because we have already decided to reverse the judgment, this assignment of error is essentially moot. Accordingly, the Fifth Cross-Assignment of Error is overruled.

## VI. Use of Expert's Notes for Impeachment

**{¶ 74}** The Snowdens' Sixth Cross-Assignment of Error states that:

> The Trial Court Erred, as a Matter of Law, When it Prevented
>
> Plaintiffs/Appellees/Cross-Appellants' Counsel from Using
>
> Defendant/Appellant/Cross-Appellee WSPI's Expert's Notes
>
> on Cross-Examination for Impeachment Purposes.

**{¶ 75}** At trial, the court prevented the Snowdens from questioning Dr. Cook about certain comments he had made when he reviewed Dr. Ekeh's medical records. Specifically, Dr. Cook had written with respect to the February 2005 hernia surgery that was converted from laparoscopic to open surgery, that it was "stupid but forgivable." (*See* Plaintiff's Trial Ex. 12, and Ex. 2 attached to Ex. 12, which was not admitted into evidence, but was made part of the record.) That comment was followed by another notation about an October 2006 surgery, which was also converted to an open surgery. Dr. Cook commented that "this was more stupid." *Id.*

**{¶ 76}** According to the Snowdens, the trial court should have allowed questioning about these comments as bearing on Dr. Ekeh's ability to handle complex surgery, and to highlight inconsistencies of Dr. Cook's characterization of Dr. Ekeh's skill as a surgeon and decision-making ability. As evidence, the Snowdens focus on the fact that when Gina's family questioned Dr. Ekeh about transferring her to the Cleveland Clinic before

the February 26-27, 2009 surgery, Dr. Ekeh assured them that he felt competent and comfortable going forward. Transcript of Proceedings, Vol. II, p. 246, and Vol. IV, pp. 667-668.

**{¶ 77}** Because the case is being remanded for retrial, this cross-assignment of error is not moot. Under Evid.R. 403(A), relevant evidence is not admissible "if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." "When determining whether the relevance of evidence is outweighed by its prejudicial effects, the evidence is viewed in a light most favorable to the proponent, maximizing its probative value and minimizing any prejudicial effect to the party opposing admission." (Citation omitted.) *State v. Lakes*, 2d Dist. Montgomery No. 21490, 2007-Ohio-325, ¶ 20. Trial courts also "have broad discretion in admitting evidence, and their decisions will not be overturned absent an abuse of discretion and material prejudice to the defendant." (Citation omitted.) *State v. Taylor*, 2d Dist. Montgomery No. 20944, 2006-Ohio-843, ¶ 58.

**{¶ 78}** The notes in question were disclosed during Dr. Cook's discovery deposition, but he was not asked about these comments during that deposition, nor was he questioned in any detail then about the 2005 and 2006 surgeries. Prior to trial, WSP admitted that Dr. Ekeh had breached the standard of care with respect to failing to do one of the following things: review the x-rays that were taken during the February 26-27 surgery; read the x-ray report; or talk to the radiologist about the x-rays. The primary issue at trial was the effect of the failure to remove the sponge on Eugenia Snowden's injuries and subsequent death. In this regard, Dr. Cook's comments, even if marginally relevant, were prejudicial, and the trial court did not abuse its discretion by refusing to

allow this evidence. We note that the Snowdens were permitted to question Dr. Cook about these prior surgeries.

{¶ 79} Based on the preceding discussion, the Sixth Cross-Assignment of Error is overruled.

VII. Discussion of Timing of Admission of Liability

{¶ 80} The Snowdens' Seventh Cross-Assignment of Error states that:

The Trial Court Erred, as a Matter of Law, When It Prevented Counsel for Plaintiffs/Appellees/Cross-Appellants from Discussing the Timing of the Belated Admission of Liability on Cross-Examination, Insofar as Defendant Admitted Liability Only at the Last Moment, After Preservation Depositions and Therefore After the Trial Had Already Commenced.

{¶ 81} WSP admitted Dr. Ekeh's breach of the standard of care shortly before trial, but the trial court did not permit the Snowdens to cross-examine witnesses about the timing of the admission. According to the Snowdens, the trial court should have allowed cross-examination of witnesses on this point because the jury was shown prior depositions taken for preservation of testimony in which WSP asked questions that implied it was still denying liability. Again, since the case will be retried, this cross-assignment of error is not moot.

{¶ 82} The depositions that were taken before trial and played at trial were the depositions of Dr. Swartz, Snowden's expert, and Dr. Remzi, who operated on Gina at the Cleveland Clinic. Dr. Remzi did not express any opinions on standards of care, and he testified primarily about the facts pertaining to his surgery. In fact, favorably to the

Snowdens, Dr. Remzi testified that Gina had a baseline chronic infection related to the sponge.

{¶ 83} Dr. Swartz also primarily testified about the main issue in the case, i.e., whether the failure to discover and remove the sponge caused Gina's subsequent injuries and death. Although Dr. Swartz was asked some standard of care questions in connection with his affidavit of merit, those questions would be precluded on retrial. We also note that the Snowdens did question Dr. Ekeh on his change of opinion about his own conduct. Specifically, when Dr. Ekeh's deposition was taken in 2012, he testified that failing to review the x-rays did not breach any standards of care. Transcript of Proceedings, Vol. IV, p. 684-685. This was appropriate impeachment, and allowed the Snowdens to challenge Dr. Ekeh's credibility.

{¶ 84} Accordingly, we see no error in the court's refusal to allow specific comment on the timing of admissions of liability. The Seventh Cross-Assignment of Error, therefore, is overruled.

## VIII. Cumulative Evidentiary Errors

{¶ 85} The Snowdens' Eighth Cross-Assignment of Error states that:

The Trial Court Permitted a Host of Additional Evidentiary Errors, Including Allowing the Admission of a Large Demonstrative Chart as an Exhibit without Foundation, Allowing Attorney Testimony During Opening and Closing Arguments, and by Excusing the Jury's Failure to Award any Damages for Loss of Consortium or Special Damages Despite Admitted Liability Despite Finding WSPI Negligent.

{¶ 86} Under this assignment of error, Snowden discusses various errors that he contends tainted the trial. We will address these alleged errors, since the case is being remanded for retrial.

## A. Use of a Demonstrative Chart

{¶ 87} At trial, Dr. Cook testified, over objection, about Defendant's Ex. F-3, which is a pre-printed drawing of an individual's intestines and stomach area. Dr. Cook did not identify where he obtained this drawing (which appears to have come from something called "TrialExhibits, Inc."). Dr. Cook also apparently drew in and labeled what he thought Gina's abdomen looked like at the time of her surgery on October 1, 2009. He based his depiction on the operative report of Dr. Remzi, and prior operative notes of Dr. Ekeh. The heading of the drawing is "Pre-operative Condition 10/1/09," and various items are labeled on the drawing, like "Encapsulated sponge," "Fluid leakage," "Fistula," "Abscess formation," and so on.

{¶ 88} The trial court allowed Dr. Cook to testify about this drawing, and also permitted it to be given to the jury as an exhibit at the end of the trial, again, over the Snowdens' objection.

{¶ 89} After a 2006 amendment, Evid.R. 803(18) provides that the following is not excluded by the hearsay rule, even if the declarant is available:

> To the extent called to the attention of an expert witness upon cross-examination or relied upon by the expert witness in direct examination, statements contained in published treatises, periodicals, or pamphlets on a subject of history, medicine, or other science or art, established as a reliable authority by the testimony or admission of the witness or by other expert

testimony or by judicial notice. If admitted, the statements may be read into evidence but may not be received as exhibits.

{¶ 90} In *Moretz v. Muakkassa*, 137 Ohio St.3d 171, 2013-Ohio-4656, 998 N.E.2d 479, the Supreme Court of Ohio stated that:

We hold that illustrations from medical textbooks are subject to the learned-treatise hearsay exception set forth in Evid.R. 803(18) and therefore shall not be admitted into evidence as an exhibit over the objection of a party. The purpose of a medical illustration is to explicate the medical text. Because an illustration gives meaning to written statements, textbook authors use them to more fully explain complex medical concepts, anatomical structures, and conditions. Thus, they do not differ from text for purposes of the rule. When a party uses a medical illustration in connection with an expert's testimony, the illustration is inextricably intertwined with both the author's statements and the testimony of the expert witness. The simple act of separating the illustration from the text by photocopying does not divorce it from its context or somehow transform it into a neutral artist's rendering.

*Id.* at ¶ 57.

{¶ 91} This would be particularly true where an expert witness draws on the illustration his or her own extrapolation of what the insides of a patient looked like, using operative notes. In *Moretz*, the court concluded that the illustration (which was actually from a textbook and was not drawn upon by the expert), should not have been admitted because it was "offered for the truth of the matter asserted by Dr. Benzel: anterior sacral

meningoceles have nerves. Accordingly, in light of the objection, the trial court was required to prevent the jury from receiving the illustration as independent evidence." *Id.* at ¶ 60. The court further concluded that the admission was unfairly prejudicial because it was evidence on a contested question and by admitting the evidence, the trial court failed to prevent the jury from giving excessive weight to the doctor's illustration and "from interpreting the illustration in the jury room on their own." *Id.* at ¶ 62 and 75.

{¶ 92} Applying this reasoning to the case before us, the trial court erred by admitting Ex. F-3 and by sending it to the jury. The error was prejudicial because what injury the sponge had caused was the significant issue in the case, Transcript of Proceedings, Vol. I, p. 189, and a contested issue in this regard was whether the sponge was "encapsulated" and, therefore, walled off from the rest of the abdomen. The implication of the encapsulation testimony was that the sponge did not cause anything other than a temporary infection, if that. By sending the drawing to the jury, the trial court improperly allowed the jury to give excessive weight to the drawing and to interpret it on their own.

## B. Attorney Testimony During Opening Statement
## and Closing Argument

{¶ 93} According to the Snowdens, counsel for WSP improperly testified during opening statement and closing argument by explaining medical records and anatomy. As an example, the Snowdens point to page 192 of the Transcript of Proceedings, Vol. I., where an objection was raised to defense counsel's remarks.

{¶ 94} As a general rule, trial counsel has great latitude in presenting argument to

a jury, and "[i]ncluded within the bounds of permissible argument are references to the uncontradicted nature of the evidence presented by the advocate." *Pang v. Minch*, 53 Ohio St.3d 186, 559 N.E.2d 1313 (1990), paragraph two of the syllabus. Trial courts have discretion over whether argument has been within appropriate bounds, and will be reversed only for abuse of discretion. *Id.* at paragraph three of the syllabus.

{¶ 95} After reviewing the record, we cannot say there was an abuse of discretion during the opening statement. After the Snowdens objected, the trial court cautioned the attorneys and also instructed the jury that attorney comments are not evidence. Transcript of Proceedings, Vol. I, p. 193.

{¶ 96} Our review of the record does reveal instances during closing argument where WSP vouched for its expert, through statements such as "One of the persons I brought in to talk to you is one of the smartest, most educated, most experienced experts I could find that I could bring, Dr. Cook * * *," and "I brought you the smartest guy that I could find on these particular issues." Transcript of Proceedings, Vol. IV, pp. 782 and 790.

{¶ 97} "It is improper for an attorney to express his personal belief or opinion as to the credibility of a witness * * *." *State v. Smith*, 14 Ohio St.3d 13, 14, 470 N.E.2d 883 (1984). *See also Jones v. Olcese*, 75 Ohio App.3d 34, 44-47, 598 N.E.2d 853 (11th Dist.1991). In *Jones*, two members of the panel concluded that counsel's argument during closing, including comments about the lack of intelligence of an opposing expert witness, were abusive, However, the judges also noted that reversal on this ground was not warranted because appellant's counsel failed to object. *Id.* at 44-47 (Ford, P.J., and Mahoney, J., concurring).

{¶ 98} Like the appellant in *Jones*, the Snowdens did not object to WSP's remarks. "Ordinarily, in order to support a reversal of a judgment based on improper closing argument to the jury, it is necessary that counsel interject a proper and timely objection to the claimed improper remarks so that the court may take proper action * * *." (Citations omitted.) *Pollard v. Hunt*, 164 Ohio App.3d 353, 2005-Ohio-5962, 842 N.E.2d 547, ¶ 13 (2d Dist.). "Furthermore, 'a judgment will not be reversed on the grounds of misconduct in closing arguments unless the circumstances are of such reprehensible and heinous nature as to constitute prejudice.' " *Hinkle v. Cleveland Clinic Found*., 159 Ohio App.3d 351, 2004-Ohio-6853, 823 N.E.2d 945, ¶ 67 (8th Dist.), quoting *Hitson v. City of Cleveland*, 8th Dist. Cuyahoga No. 57741, 1990 WL 204337, *5 (Dec. 13, 1990). (Other citation omitted.) The improper remarks in this case during closing argument were isolated, and, under the standards cited, do not warrant reversal.

## C. Failure to Award Damages for Loss of Consortium
## or Special Damages

{¶ 99} The Snowdens' final argument is that the trial court erred by excusing the jury's failure to award damages for loss of consortium or special damages, despite finding that WSP was negligent and that its negligence caused injury to Gina. This was a ground mentioned in the Snowdens' post-trial motions for a new trial, jnov, and relief from judgment. Again, the trial court concluded that these issues were moot in light of its decision on the set-off issue.

{¶ 100} In *Ayers v. Ishler*, 5th Dist. Delaware No. 11 CAE 01 0001, 2011-Ohio-4272, one of the issues was whether a new trial should have been granted in view of the

fact that the jury had awarded an injured plaintiff money for past medical bills and past pain and suffering, but did not award any damages for future loss of enjoyment, future pain and suffering or future medical bills. The jury also did not award the plaintiff's husband any damages for loss of consortium. *Id.* at ¶ 6 and 41. The court of appeals observed that a trial court has sound discretion whether to grant a new trial based on the weight of the evidence. *Id.* at ¶ 55, citing *Yungwirth v. McAvoy*, 32 Ohio St.2d 285, 286, 291 N.E.2d 739 (1972).

{¶ 101} In the case before us, there is no decision to review, because the trial court concluded that the Snowdens' post-trial motions were moot, given the court's decision on the set-off issue. This was clearly erroneous. For example, if a new trial were warranted, the issue of set-off would no longer be relevant, although that could later change based on the results of a retrial.

{¶ 102} "In order to set aside a damage award as inadequate and against the manifest weight of the evidence, a reviewing court must determine that the verdict is so gross as to shock the sense of justice and fairness, *cannot be reconciled with the undisputed evidence in the case*, or *is the result of an apparent failure by the jury to include all the items of damage making up the plaintiff's claim*." (Emphasis sic.) *Id*. at ¶ 56, citing *Bailey v. Allberry*, 88 Ohio App.3d 432, 435, 624 N.E.2d 279 (2d Dist.1993).

{¶ 103} In the case before us, Dr. Ekeh conceded that his negligent actions caused injury to Gina and that the June 2009 operations were required as a result. The jury awarded Gina $100,000 in pain and suffering, but did not award any amount for medical bills. However, the evidence was that MVH waived the $397,007.88 charge for the admission between June and August 2009. *See* Plaintiff's Ex. 10. If the jury verdict

was based on acceptance of Dr. Ekeh's testimony, the jury could reasonably have concluded that the Snowdens were not entitled to medical expenses that had not been paid.[2]

**{¶ 104}** Although Dennis Snowden's general testimony about loss of consortium was undisputed, the jury did not award him any damages. However, as was noted in *Ayers*, even if undisputed evidence exists, the jury has "the inherent power to reject the evidence presented." (Citation omitted.) *Id.* at ¶ 60.

**{¶ 105}** Furthermore, the jury rejected the wrongful death claim, and apparently limited damages to the events that Dr. Ekeh admitted having proximately caused by his negligence – the surgeries of June 2009. Dennis Snowden's testimony about his loss of consortium centered on Gina's death, and he devoted virtually no attention to losses he encountered while Gina was hospitalized. In fact, no evidence was presented at all about his loss of consortium during June 2009. Accordingly, we cannot say that the motion for new trial should have been granted on the basis of inadequate damages for loss of consortium.

**{¶ 106}** Based on the preceding discussion, the Eighth Assignment of Error is sustained in part and is overruled in part. Again, this matter will be remanded for a new trial.

---

[2] Assuming that Dr. Ekeh's admission was the basis for the jury's verdict, there were a few expenses in June 2009 that were not written off. For example, Dr. Ekeh was paid $240.03 for services on June 11, 12, and 13; and an ambulance charge of $168.49 was paid for June 9, 2009 (presumably to bring Gina to MVH from the long-term care facility where she was being treated before returning to MVH for the attempted retrieval of the sponge). *See* Plaintiff's Exhibit 10. However, these amounts were minimal, and the judgment is being reversed for other reasons, in any event.

## IX. Production of Settlement Agreement

{¶ 107} WSP's assignments of error are inter-related and will be discussed together. WSP's First Assignment of Error states that:

Defendant-Appellant Argues the Lower Court Improperly Denied Wright State Physician, Inc.'s Motion for Production of the Settlement Agreement Entered into between Plaintiffs-Appellees and Defendants, Miami Valley Hospital, Premier Health Partners and Their Respective Agents.

{¶ 108} WSP's Second Assignment of Error states that:

Defendant-Appellant Argues the Lower Court Erred in Overruling Wright State Physician, Inc.'s Motion for Judgment Notwithstanding the Verdict after Improperly Finding that the Settlement between Plaintiffs-Appellees and Defendants, Miami Valley Hospital, Premier Health Partners and their Respective Agents, Was for Plaintiffs' Wrongful Death Claim Alone.

{¶ 109} Under these assignments of error, WSP argues that the trial court erred in refusing to allow production of the settlement agreement between the Snowdens and the parties who had been dismissed. WSP also contends that the trial court erred in solely relying on the probate court documents to decide that set-off should not occur because the settlement and the jury verdict were not for the same injury, i.e., the settlement was for wrongful death, and the jury verdict was for the survival action. WSP apparently filed a motion for jnov because the judge who presided over the trial did not rule on its motion for discovery of the settlement agreement in a timely manner.

{¶ 110} As was noted above, R.C. 2307.28 permits set-off of a potential tortfeasor's settlement in certain circumstances. Because the judgment is being reversed and the cause is being remanded for a new trial, the set-off issue is not currently relevant. WSP's assignments of error, therefore, are moot. However, in the event of a future judgment for the Snowdens on retrial, we agree with WSP that the trial court should review the settlement agreement, which if confidential, can be filed under seal. At present, we express no outcome as to the effect of R.C. 2307.28, since the settlement agreement is not part of the record, and we have no idea of its content.

{¶ 111} Accordingly, the First and Second Assignments of Error are overruled, as moot.

X.   Conclusion

{¶ 112} WSP's First and Second Assignments of Error are overruled as moot. The Snowdens' Second and Third Cross-Assignments of Error are sustained, and the Eighth Cross-Assignment of Error is sustained in part and overruled in part. The Snowdens' First, Fourth, Fifth, Sixth, and Seventh Cross-Assignments of Error are overruled. The judgment of the trial court is reversed, and this cause is remanded for a new trial.

. . . . . . . . . . . . .

FAIN, J. and HALL, J., concur.

Copies mailed to:

Gary J. Leppla
Philip J. Leppla
Frederick A. Sewards
Sabrina S. Sellers
Lance Oliver
Neil Freund
Dale Goldberg
Julia Turner
Hon. Richard Skelton